FRANCIS T. HOMER ET AL. *v.* CROWN CORK
AND SEAL COMPANY ET AL.

[No. 49, January Term, 1928.]

*Decided April 5th, 1928.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Clifton S. Brown* and *Samuel J. Fisher,* with whom was *Hall Hammond* on the brief, for the appellants.

*Albert E. Donaldson* and *Raymond S. Williams,* with whom were *Hershey, Donaldson & Williams* on the brief, for the appellees.

PARKE, J., delivered the opinion of the Court.

The appellants, Francis T. Homer, Luther M. R. Willis and Bertha F. Goldenberg, were the complainants, and the appellees, the Crown Cork and Seal Company of Baltimore City, a corporation, and the chairman of its board of directors and its vice-president, and its directors, were the defendants, in a bill of complaint filed with the object of enjoining the corporate defendant, its officers and agents, from committing any act whatsoever looking towards or in furtherance of the sale of the corporate assets of the corporation as a whole, and particularly from holding the meeting of stockholders called for the purpose of ratifying a resolution of the board of directors that authorized a sale of all the assets of the corpo-

ration as a whole, and to show cause why the temporary injunction sought should not be made permanent. Upon the order to show cause, the appellees demurred to the bill of complaint, and, this demurrer having been sustained and the bill dismissed, the appellants have brought this appeal.

The Crown Cork and Seal Company of Baltimore City, which we shall hereafter refer to as the Corporation or Baltimore Corporation, was organized pursuant to the laws of the State of Maryland, where it has its principal place of business, with a capital stock of 10,000 shares of the par value of one hundred dollars each. Nine thousand five hundred shares of its corporate stock have been issued and are outstanding. The appellants own 318 shares of this stock, or about three and one-third *per centum* of the stock issued, and they were acting for themselves and for such other stockholders as would join them and share in the expenses. The Corporation has been engaged for a number of years in Baltimore in the manufacture of plants and equipment for the making and sale of caps for bottles, and of the machinery for placing and closing the caps upon bottles; and of agglomerate cork sheets, cork discs, and other cork specialties. In connection with its business the Corporation owns or controls various companies in foreign countries. Its largest competitor has been the New Process Cork Company of Brooklyn, New York, and the business rivalry between the two has been keen, and the Corporation had until the end of the fiscal year of 1926 always declined the overtures of the New Process Cork Company to enter into any co-operative trade agreement. The two companies jointly controlled, in about equal proportions, more than fifty *per centum* of the annual consumption of caps in the United States; and more than eighty *per centum* of the agglomerate discs used annually in this country.

During January and February, 1927, a certain Charles E. McManus, the president of the New Process Cork Company, and one Gerson W. Beringer, with James G. Moses and Henry Bennett Leary, formed a combination to buy and control a majority of the shares of stock of the Corporation,

so as to unite its business with that of the New Process Cork Company in order to put an end to their keen competition. The combination bought for their common account from dissatisfied stockholders approximately 6,500 shares of stock, which was slightly in excess of two-thirds of the shares of stock issued, at prices ranging from $250 a share to $275 a share, so that the average price of every share of stock, including commissions, fees and other expenses, was $277. After this block of stock had been acquired for the pool, 1,246 shares were bought at a price in undisclosed excess of the average price mentioned. These purchases gave the buyers 7,746 shares of stock, or slightly in excess of eighty-one *per centum* of all the capital stock outstanding. Although the four parties named, with their associates, are the owners of the stock, it has been transferred upon the books of the Corporation in the names of various individuals, firms, and corporations, so as to conceal the real ownership, in an effort to relieve the actual owners and corporations associated with them from liability for the acts of which the appellants complain. Notwithstanding the paper title to these shares of stock, the control of the shares of stock so bought for the pool is in its four members and their associates and bankers, with the result that since March, 1927, the management and operation of the Corporation and of the New Process Cork Company have been in the hands and under the control of the same persons and interests.

Under date of July 15th, 1927, a formal notice was sent to the stockholders of the Corporation that called for a special meeting to approve of an agreement of sale of all the property and assets of the Corporation to the New York Improved Patents Corporation, a corporation organized under the laws of the State of New York, at and for a price which in liquidation would equal two hundred and seventy-seven dollars per share to every stockholder of the Corporation. In the letter accompanying this notice, the chairman of the board of directors wrote: "If the agreement should be approved, and if this sale should be made, the purchasing company proposes, as I have been told, to consolidate the

business of your company with that of the New York Process Cork Company, Inc." The meeting, and its two adjournments, resulted in an abandonment of the proposed sale, because, as was announced by their representative, the owners of more than two-thirds of the outstanding capital stock, although possessing the power, were unwilling to proceed without virtually the unanimous consent of the shareholders.

However, the plan was revived and on November 17th, 1927, another special meeting of the stockholders was called for November 28th to consider a similar sale; and, on November 26th, 1927, was filed the bill of complaint in this cause asking for a temporary and then a permanent injunction restraining the proposed sale.

The question proposed for submission to the stockholders was an agreement of sale, which had been formally approved by the directors of the Corporation, and which provided for the sale of all the Corporation's property and assets as an entirety, including its good will and franchises (except its franchise to be a corporation), to the New York Improved Patents Corporation, a corporation organized pursuant to and existing under the laws of the State of New York, or its successors, at a price which would liquidate every share of stock of the Corporation at $277 a share.

Accompanying its proposal to pay, as set forth above, and revealing that it was acting for undisclosed principals, who would vote the shares of stock thus obtained for the contemplated sale of the assets of the Corporation, the New York Improved Patents Corporation offered, (a) independently of the authorization of the sale by the stockholders of the Corporation, to pay in cash $277 to every stockholder of the Corporation desiring to sell; (b) or in the event that the proposed sale of the assets should be consummated, to give to every stockholder of the Corporation, who would subscribe in advance of the sale, the privilege of buying when, as, and if issued, stock of the New York Improved Patents Corporation on a basis which would give the stockholders for each, or as many of his present shares in the Corporation as he would wish, seven and seventy-five hundredths (7.75) shares

of the preferred and two and eight-tenths (2.8) shares of common stock of the purchasing company. In addition to this offer, the letter of the New York Improved Patents Corporation stated that it had been organized for the express purpose of acquiring certain patents and formulas which had been used upon a royalty basis by the New Process Cork Company, Inc., and of consolidating with the latter corporation, and of purchasing the assets of the Baltimore Corporation. The resulting commercial, economic and financial benefits and advantages of this plan were outlined; and details concerning the capitalization and assets, the indicated net income, and the market value of the preferred and common stock, of the New York Improved Patents Corporation, were set forth for the consideration of the stockholders of the Corporation, who were advised where further information might be obtained.

It was also explained in the notice from the board of directors of the Corporation that, if the sale be effected to the New York Improved Patents Corporation, the latter corporation intended forthwith to consolidate with the New Process Cork Company, Inc., whose stockholders had approved of this consolidation and were not afforded an opportunity to sell their holdings for cash, but are to receive for their shares of stock a certain named proportion of the preferred and common stock of the New York Improved Patents Corporation. The notice pointed out to the stockholders why the directors regarded the sale of the assets as advantageous to the Corporation's stockholders, and why the directors believed the offer by the New York Improved Patents Corporation to their corporate shareholders either to pay the specified price or to subscribe for its stock on the given basis was more favorable to the shareholders of the Corporation than to the shareholders of the New Process Cork Company under the terms of its consolidation.

The facts thus narrated are those found in the bill of complaint and exhibits, and state the not uncommon instance of a corporation consolidating with another and acquiring by purchase all the assets of a third, in order to eliminate

their competition and wasteful duplication, increase efficiency of operation, lessen the cost of financing, of production and of selling the product. As has been seen, it was the New Process Cork Company which was to be consolidated with the New York Improved Patents Corporation, and the Crown Cork and Seal Company of Baltimore City whose assets were to be purchased by the first named corporation. The plan did not contemplate the consolidation of the Crown Cork and Seal Company, as would appear from some of the statements found in the bill of complaint and, so, set forth in the recital of the allegations found in this opinion. Up to this point, there is no ground for equitable intervention by injunction, but the bill of complaint contains further charges which appellants urge establish their equity. These allegations attempt to show fraud in the form of concealment, of disclosure of trade secrets, and of bad faith in the proposed sale. The substance of these allegations will be set forth and considered in order.

1.  It is alleged that, after the combination obtained control through the purchase of more than two-thirds of the outstanding shares of stock, they elected a board of directors and filled the offices of the Corporation with men of their own choice and obedient to their direction, "for the sole and distinct purpose, your orators believe and therefore aver, to hide and secrete from each and every stockholder who would not be coerced into selling his shares, all information whatsoever concerning the affairs of the company."

The charge of a fraudulent purpose in the removal of directors and officers, who had been selected by the former stockholders and their board of directors to operate the Corporation, direct its policy and manage its affairs, and the substitution of other directors and officers in harmony with what a different group of stockholders, owning at least eighty-one *per centum* of the shares of stock entitled to participate in their selection, deemed to be in the interest of the stockholders, is based upon belief, and no facts are stated in the paragraph from which the above quotation is taken upon which it could be inferred that this change in the

corporate official personnel was "for the sole and distinct purpose" of hiding and secreting all information concerning the affairs of the Corporation from those stockholders opposed to the proposed sale. So, if there be any justification for the sweeping accusation made, it must be found from facts and circumstances alleged in the bill of complaint. An allegation of fraud may be made upon belief only when the facts are set forth upon which that belief is reasonably founded.

In the scrutiny of the bill of complaint, to find averments of facts from which concealment or fraud may be deduced, it is important to bear in mind that the appellants were in possession of the thirty-fifth annual report of the Corporation for the year ending December 31st, 1926, which was made on February 19th, 1927, and certified to by accountants and auditors; that the present ownership of the controlling shares of stock did not exist earlier than January or February, 1927, that since March, 1927, the management has been in the hands of the representatives of the combination; and that the bill of complaint was filed on November 26th, 1927. Thus the period of the alleged concealment or fraud against the minority stockholders is limited to the comparatively brief period between March 3rd, and November 26th, 1927. There are two allegations of fact with reference to concealment. The first is that the appellants "have at various times requested and insisted that the management, if they desired to sell the assets of the corporation in their entirety, should produce a valuation made by competent experts, so that the minority stockkholders could be advised and determine what was the proper value for the assets, and what was a proper liquidating price for their shares of stock. In each and every instance Gerson W. Beringer, Henry Bennett Leary, and those associated with them, have refused to give unto your orators the information so requested." It is clear that this is not a denial of information, but a refusal to comply with the demand of a few minority stockholders to have a fresh valuation of its assets made by experts for the information of the minority

stockholders. The question of a fresh valuation by experts was one of policy, and the refusal to authorize one was neither a concealment of facts known to the majority stockholders and unknown to the minority, nor a deprivation of any inherent right in the minority stockholders. The second alleged concealment is in respect to the offer of the New York Improved Patents Corporation to give to the stockholders of the Baltimore Corporation an opportunity to subscribe, on a specified basis of exchange, for the preferred and common stock of the first named corporation, provided the sale of the assets of the Baltimore Corporation be consummated as proposed. The criticism of this offer is that "it fails to show (1) what are to be the capital assets of said corporation (to wit: no statement of assets and liabilities); (2) what are estimated to be the annual earnings of the said corporation; (3) how the remainder of the 1,455,000 shares of preferred stock is to be issued and at what price; (4) how the remainder of the 275,000 shares of Class 'B' are to be issued, or that their issuance will not be in cash or services to the corporation." The appellants state that all this information was refused them "when in stockholders' meeting assembled upon the 25th day of June, 1927." The occasion specified was the meeting of the shareholders to act upon the first or abandoned proposal of sale of the Corporation's assets. There is no allegation that at any other time or place this information was sought or refused, although in the offer of November 17th, 1927, it was stated that further information might be obtained at the office of the Baltimore Corporation or at the office of Leary & Rood in New York. It is true that the proposition of June 15th, 1927, referred the prospective subscriber to the same sources of information, but the refusal to give the information desired at the stockholders' meeting held on June 25th did not warrant the averment that this information was definitely and positively refused under a similar but, in law, wholly different offer submitted on November 17th, 1927, when the complaining shareholders never applied at either of the

designated places for information before the institution of these proceedings.

The allegations quoted from the body of the bill are modified by the exhibits, which constitute a component part of the bill of complaint. Without stating their contents, it is found that much information is given with regard to the capital assets and liabilities, the prospective net income, and market value of the preferred and common stock, and the bases upon which the preferred and common stock was to be issued to the shareholders of the New Process Cork Company, Inc., and to those of the Baltimore Corporation who would elect to subscribe on the terms presented. After the stock had been appropriated to these purposes, the residue of the unissued preferred and common stock would be presumed to have been or to be issued for corporate purposes under and in conformity with the laws of the State of New York. However, if there had been an inquiry made after the offer on November 17th, a refusal to give the information sought would have been a denial of what might have been helpful in the exercise of the appellants' option to subscribe for stock in the New York Improved Patents Corporation; but would have left unaffected the question whether $277 a share was a fair price to be paid, in liquidation, to every stockholder for every share of stock in the Baltimore Corporation. It follows that the allegations now being discussed, which are in general terms or. relate to prospective conditions, do not constitute any ground for relief, as a declination to give the indicated information is not shown by the bill of complaint to have been material in estimating the propriety and advantage of the proposed sale of assets of the Baltimore Corporation. Even a shareholder does not enjoy an unlimited right to demand and receive information in respect to corporate affairs. Code, art. 23, secs. 84-87; *Wight v. Heublein,* 111 Md. 657; 2 *Machen on Corporations,* secs. 1094-1113.

2. Another ground upon which the charge of fraud rests is that the Corporation owned and held many trade processes

and secrets, which had been developed in its laboratory relating to the manufacture of caps and which, while not patentable, were highly important to maintain its competitive position and of great value to the Corporation, so long as they were kept secret from a competitor; and that immediately after securing enough shares of stock to control the Corporation, or in March, 1927, Charles E. McManus, president of the New Process Cork Company, Inc., and, with Gerson W. Beringer, the dominant party in the combination having obtained control of the Corporation, went, on numerous occasions, to the plants of the Corporation, where he demanded and received full particulars of all trade processes and secrets as well as full details of all costs and agreements which the Corporation had made with its customers, without giving in return any of the trade processes or secrets of the New Process Cork Company or in any way recompensing the Corporation for the information so obtained. It is further alleged that McManus obtained this information by reason of his position in the combination and with the knowledge and consent of Beringer, who was at that time a director and chairman of the board of directors of the Corporation, and of Henry Bennett Leary and James Garfield Moses, both directors of the Corporation.

The bill of complaint assumes that the knowledge of McManus as one of the two dominant parties in the combination now in control and operating the Corporation is the knowledge of the New Process Cork Company, Inc., of which McManus was the president. This is not true unless the knowledge acquired by McManus was communicated by him to the New Process Cork Company, Inc. And there is no allegation that McManus has not kept this knowledge secret; nor that the New Process Cork Company, Inc., or any other company, has this knowledge, nor that McManus or any other person, firm, or corporation has ever made use of this knowledge, save in the interest of its owner, the Baltimore Corporation. And there is no definite allegation which would impute to McManus any other purpose than

to acquire necessary information for the furtherance of the business interests of the Baltimore Corporation. So long as McManus keeps inviolate the knowledge he thus acquired, and which it was necessary for the new owners of the Corporation to have in order to conduct advisedly its affairs, he has violated no trust or obligation, and the essential quality of secrecy is as much assured as if McManus were not connected with any competing corporation. The appellants contend, however, that because of this knowledge by McManus, although uncommunicated, the minority stockholders would receive for their stock under sections 35 and 36 of article 23 of the Code only an amount equal to its fair value "after (as your orators charge) they (*i. e.*, the assets) had been fraudulently depleted and depreciated by the acts" which put McManus in possession of the trade processes and secrets. As has been seen, the bill of complaint does not set up any fact upon which a charge of fraud can be sustained in this connection. No matter what the knowledge of McManus may be, nor what possible undisclosed and ulterior motive prompted his action, these trade secrets and processes are the property of the Baltimore Corporation, and neither McManus, nor any other unauthorized person, firm, or corporation has any right to make use of them. It is only in the event that McManus should divulge the secret formulas or processes to a person who is a purchaser for value without notice that such a person would have the right to use these trade secrets, but a mere volunteer, or a purchaser with notice, deriving his title under a breach of trust, would acquire no beneficial interest in the secrets. *Taylor Iron etc. Co. v. Nichols,* 70 N. J. Eq. 561; *Pomeroy v. Pomeroy,* 77 N. J. Eq. 293; *Salomon v. Hertz,* 40 N. J. Eq. 400; *Vulcan etc. Co. v. American Can Co.,* (N. J.) 69 Atl. 1103; 2 *Joyce on Injunctions,* secs. 924, 926, 451; *Morison v. Moat,* 9 Hare, 241, 263, 68 Eng. Reprint 492, 501; *Tabor v. Hoffman,* 118 N. Y. 30; *Peabody v. Norfolk,* 98 Mass. 452; *Merryweather v. Moore* (1892), 2 Ch. 518. 525, 526; 2 *Story's Eq. Juris.* (14th ed.), sec. 1283; 4 *Pomeroy's Eq.*

*Juris.* (4th ed.), sec. 1689, note; *Chicago Board of Trade v. Christie Grain etc. Co.,* 198 U. S. 236, 251, 49 L. ed. 1031, 1039; *Acker, Merrall & Condit Co. v. McGaw,* 106 Md. 536, 551-558; *Robb v. Green* (1895), 2 Q. B. 315.

Since it does not appear, and is not averred, that the trade secrets of the Baltimore Corporation have been divulged in course of trade, they have not lost their commercial value; and inasmuch as these trade secrets are the property of the Baltimore Corporation, they constitute a part of the assets and must, under the allegations of the pending bill of complaint, be considered as of unimpaired value in determining the worth of its shares of stock. *Supra.* Compare *Green v. Folghan,* 1 Sim. & St. 398, 406, 57 Eng. Reprint, 159, 162. See Code, art. 23, secs. 35 and 36. Compare *Wall v. Anaconda Copper Co.,* 216 Fed. 242; *Cole v. Wells,* 224 Mass. 504; *Shaw v. Holland* (1900), L. R. 2 Ch. 305. 307.

3. Before the World War the Corporation had been conducted with great financial success, but thereafter had suffered severe reverses, but during the years 1925 and 1926 the Corporation ceased to lose money and began to be profitable, and, because of this change, the appellants support the charge of fraud on the theory that the liquidation value of $277 for every share of stock is grossly inadequate. This contention is based upon the balance sheet and report for this fiscal year 1926, which shows a book value of $557.49 a share, and a net profit of $46.39 per share, and, upon the appellants' forecast "that they believe and therefore aver that the year 1927 will show a profit approximately equal to that shown in the year 1926, and that the Corporation should have two years of earnings at greater than $40 a share per annum, with a book value exceeding $600 per share." If these allegations stood alone, of a proposal by a board of directors, and its certain adoption by the requisite vote of shareholders, that all the assets of one corporation be sold to another corporation at a price so greatly below the alleged value of these assets as to be indicative of a breach of duty to the selling corporation, the chancellor should not hesitate to intervene by injunction in order that the contemplated action

be probed and prevented, if fraudulent, in view of the pregnant circumstance that the board of directors and the necessary majority of stockholders in each corporation were either identical or acting pursuant to a common scheme and in obedience to the same central control. The theory of the appellants is that a gross inadequacy of price is accompanied by collusion between two boards of directors, who represent but a single dominant will, in order that the assets of one corporation may become the property of the other at less than half its value through the approval of each corporation by the requisite majority vote of stockholders, who, in both corporations, are under the absolute control of the same dominant will or ownership. If this were the effect of all the allegations of the bill of complaint, the question would not be one of controversy between the majority and minority stockholders over value, in respect to which wide variance in opinion may honestly subsist, but would be one of fraud, which would be peculiarly the province of equity and so take the question out of the statute, since section 36 of the Code contemplates proceedings begun and consummated in good faith and not those infected with fraud. However, to take the bill at bar out of the statute, the fraud must be affirmatively shown, and if, on consideration of all the allegations of the bill of complaint, it appear that the fundamental issue thus made is not fraud but a debatable controversy over value in an *intra vires* corporate matter, then the resolution of the difference of opinion of the majority and minority stockholders must be according to the provisions of section 36 of article 23, notwithstanding the unity of interest, control, action, and purpose of the directors and stockholders of both the selling and the buying corporations. *Booth v. Robinson,* 55 Md. 419, 441; *Shaw v. Davis,* 78 Md. 308, 319; *Davis v. U. S. Elec. Co.,* 77 Md. 45; *Cannon v. Brush Electric Co.,* 96 Md. 446, 470; *Penna. Ry. Co. v. Minis,* 120 Md. 461, 485; *Macgill v. Macgill,* 135 Md. 384; *Colgate v. U. S. Leather Co.,* 73 N. J. Eq. 72; *Koehler v. St. Mary's Brewing Co.,* 228 Pa. St. 648; *Howeth v. Coulbourne Bros.,* 115 Md. 107, 117; *Northwest Transportation Co. v. Beatty,* L. R. 12

App. Cas. 589; *Mooreman v. Nat. Zinc Corp.*, 82 N. J. Eq. 493, 500; *Gamble v. Queens County Water Co.*, 123 N. Y. 91, 98, 9 L. R. A. 527; *Northern Securities Co. v. United States*, 193 U. S. 197, 361, 48 L. Ed. 679; *Pearsall v. Great Northern Ry.*, 161 U. S. 646, 671, 40 L. Ed. 838; *Manson v. Curlis*, 223 N. Y. 313.

An analysis of the bill of complaint makes plain that the basis of the fraud alleged is the charge that the price offered is grossly inadequate. The net amount to be agreed upon is at the rate of $277 for every outstanding share. In sharp contrast with this, the appellants allege a book value of $600 a share, and a net earning capacity of $40 annually upon every share. As opposed to the book value, which is the Corporation's own appraisement, there is the market value, which is the market's valuation. Both estimates are affected by many conditions, some of which are obscure, and neither may unreservedly be relied upon, but the one which more probably reflects the actual worth of the assets is the market value of the shares of stock, since it is subject to constant revision and is the consensus of financial opinion as expressed by those best informed while engaged in the competitive selling and buying of the assets of the Corporation. *Irving Fisher's Nature of Capital and Income*, pp. 70-80.

The appellants do not give a single instance of a share of stock selling for a sum in excess of the offer, much less at any approximation of $600. And while the prediction of a net earning of greater than $40 a share yearly for 1926 and 1927 had some basis in the report for the fiscal year 1926, showing a net earning of $46.39 per share, yet that amount did not go to the stockholders, but was carried into the earned surplus, and, instead of dividends, the stockholders received the statement that "with mortgage restrictions as they are, it does not seem probable that your company itself will be able to pay dividends for some time." An examination of the balance sheet for the fiscal year 1926, upon which the book value is estimated, shows a number of entries whose significance could only be ascertained by a knowledge of

what they represent. It is a commonplace in business that, although a balance sheet is worked out to the last penny and has the form and the appearance of impregnable accuracy, yet it may actually be far from a true presentation of the actual financial condition. No purchaser would accept the book value as the real or fair value of the assets without first investigating and verifying that there was an equivalent in assets for every dollar in figures. How then can the pleader expect his estimate of value to be adopted when it is shown to be a mere book value without any allegation, even of opinion, that this is the real or fair value?

The arbitrary nature of this book value is illustrated by the statement in one of the exhibits, which the bill does not deny nor qualify in any cognizable way, that the price offered is more than has been paid for the stock in recent years. Furthermore, between January and March, 1927, the combination bought of those in control of the Corporation, who were therefore in a position to know its value, between eighty-one and eighty-two *per centum* of the outstanding stock on the open market. Of these shares, 6,500, which is more than the two-thirds majority required under the statute to authorize a sale of all the assets of the Corporation, were purchased at prices varying from $250 to $275 a share. The bill of complaint averred that the offer at the rate of $277 a share was arrived at by taking the aggregate price paid by the combination or group for the stock so purchased by them, plus commissions, fees and interest charges to the first of July, 1927, and dividing this amount by the number of shares so purchased, which gave the quotient 277.06, making the amount proposed two dollars in excess of the highest price paid a share. The bill of complaint, however, does charge that 1,246 shares of the stock was bought "at a price for (far) in excess of the average price," but that this price is not included in the average price mentioned. The appellants do not give this price or the excess, which they must have known in order to have made the comparison upon which this allegation is based. The unexplained omission of the cost of this block of stock destroys the effect

of the allegation, since in a charge of fraud the essential facts must be set forth, and any omission of a material circumstance cannot be supplied by suggestion in the bill or by conjecture on the part of the chancellor. *Boyd v. Shirk,* 125 Md. 175, 179; *Kernan v. Carter,* 132 Md. 577, 585; *Upman v. Thomey,* 145 Md. 347; *Frisch v. Frisch,* 150 Md. 271; *Euler v. Schroeder,* 112 Md. 155, 158; *Miller's Equity Proc.,* sec. 580. In the consideration of the demurrer no weight can be attached to what is not well pleaded, so it follows that the language quoted cannot be regarded as alleging that the group or its bankers bought any of the stock at a price in excess of two hundred and seventy-five dollars. In this connection, it should be observed that at least eighty-one *per centum* in value of the stockholders are willing to accept the price offered. Although the bill of complaint was filed by two stockholders for the benefit of all who would join therein and share their proportion of the expenses of the proceedings, but one other stockholder intervened, and the three represent only 318 shares, or slightly over three and one-third *per centum* of the 9,500 issued. The remaining 1,436 shares, or a fraction over fifteen *per centum* of the total issue, have failed to unite with the appellants. Hence comparatively few shareholders have expressed dissatisfaction with the proposed sale, and this is a negative circumstance entitled to some consideration in determining whether on the allegations of the bill the proposed sale is at a fraudulent price. See 6 *Fletcher on Corporations,* sec. 3982.

To sum up, the gravamen of the complaint is inadequacy of price. The fundamental difference between the majority and minority stockholders on this record is simply whether the value of the assets for the purpose of a sale in their entirety is the market value of the shares of stock or their book value. It is not perceived how holding to either view is practicing a fraud. Nor can it be said that the appellants have any substantial ground to ask that the book value be accepted, on the allegations of the bill, as the criterion of value by which the adequacy of the offer must be tested,

since nowhere is it claimed that the book value is the real or fair value of the shares of stock, but one of the specific complaints brought is the refusal of the appellees to have a valuation made by competent experts of the corporate assets, "so that the minority stockholders could be advised and could determine what was the proper value for the assets, and what was a proper liquidating price for their shares of stock."

Aside from the fraud imputed from the price to be paid, there has been found no well pleaded allegations from which fraud affirmatively appears. The price offered, which was slightly in excess of the market price, may be too low or too high to be taken as fair value, but, under the facts set forth in the bill of complaint, it is clearly not so inadequate, when weighed in connection with all the circumstances, as to make voidable for fraud the action of the directors of the two companies, and of the necessary majority of the stockholders of one and of the prospective action of a like majority of the shareholders of the other, in approving of the proposed sale. The fact the directors and officers and the required majority of stockholders are all acting in concert, as a result of a preconceived plan, necessarily subjects their action to close scrutiny, but of itself affords no basis for a charge of fraud. The fair value of the stock of a manufacturing business is necessarily uncertain and largely a matter of opinion, since the factors upon which that value depends are uncertain, contingent and prospective. It is for this reason that the fair value of an industrial enterprise is not a constant sum but one of flux. No one may say that the adoption of the market value of the stock of an industrial enterprise as the consideration for a purchase of corporate assets is fraudulent or even unreasonable, unless falsified by something more tangible than the unverified and unsupported book value of the corporation, especially when those in control, with their intimate knowledge of the present and prospective affairs of the corporation, were willing to part with that control and sell their stock at the price offered. Unless acting *ultra vires*, illegally, or in bad faith, the directors of a corporation of the prescribed

class have a statutory right to approve of a sale of all its assets as an entirety at a given price, and the stockholders owning two-thirds of all the stock outstanding and entitled to vote may approve of such sale, and it will then be made. This is a property right of which the shareholders, while acting in good faith, may not be deprived, no matter the motives nor the folly and consequences of their action. *Supra; France on Corporations* (2nd ed.), p. 59, sec. 38, p. 62. A sale so authorized is, however, subject to the right of the dissentient minority to be paid, notwithstanding the sale price, the fair value of his stock.

Section 36 of article 23 of the Code assures to every shareholder fair value for his shares of stock, if ho was present at the stockholder's meeting and voted against the agreement submitted, and, within twenty days after such meeting, made a written demand on the corporation for the payment of his stock. The amount he shall receive for his shares is their fair value, unaffected by the sale. If the stockholder and his corporation fail to agree upon the fair value of his stock, or if, having agreed, the corporation shall fail to pay or tender the amount thereof, the stockholder is ontitled to file a petition against the corporation for an accounting, and for the ascertainment of the fair value of his shares. Further provisions found in sections 36 and 35 contemplate the appointment by the court of three disinterested commissioners to appraise the fair value of his stock without regard to any depreciation or appreciation thereof in consequence of the sale. The court in its reference to the commissioners is required to prescribe the time and manner of producing evidence, if necessary. The award by the commissioners, when confirmed by the court, is made final on all parties, unless the stockholder or the corporation should be aggrieved, when an appeal is provided to the Court of Appeals.

The proceedings by the dissenting stockholder does not delay or prevent the execution and performance of the contract of sale, but the vendee or grantee will take the property of the grantor corporation subject to its debts and liabilities, including the claim of the dissenting stockholder,

and such property shall be subject to execution on any decree passed, and this decree is given priority over any encumbrance placed by the grantee corporation upon the property so bought.

These provisions of the statute assure to the minority stockholder a full, ample, and complete remedy to secure the fair value of his stock, with a provision for review and the right of appeal to this tribunal. In our judgment the bill of complaint states a cause where the fundamental inquiry is one of value in an *intra vires* corporate transaction, and the statute would seem expressly adapted to afford the appellants all the relief to which they may be entitled. For the reasons assigned, the decree of the chancellor will be affirmed.

*Decree affirmed, with costs.*