847 F.2d 1100
 57 USLW 2012, RICO Bus.Disp.Guide 6954
 Margaretha WALK, an individual; Maurice Walk, Trustees for
the Cynthia Walk Trust, the Dinand M. Walk Trust
and the Margaretha Walk Trust; Vincent
Ciarlante, Plaintiffs-Appellants,
v.
The BALTIMORE AND OHIO RAILROAD; Chesapeake and Ohio
Railroad; The CSX Corporation, Defendants-Appellees.
 No. 87-3585.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 6, 1988.
Decided May 31, 1988.
 
 Ellen M. Doyle (Michael P. Malakoff, Berger, Kapetan, Malakoff & Meyers, P.C., John B. Isbister, Tydings & Rosenberg on brief), for plaintiffs-appellants.
 Ward Baldwin Coe, III; William F. Ryan, Jr., (Wilbur D. Preston, Jr., Richard J. Magid, Whiteford, Taylor & Preston, Alan A. Rudnick, General Counsel, CSX Corp. on brief), for defendants-appellees.
 Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Following the announcement by CSX Corp. (CSX) of a statutory short-form merger of one of its subsidiaries, the Baltimore & Ohio Railroad (B & O), into another, the Chesapeake & Ohio Railroad (C & O), appellants Margaretha Walk, Maurice Walk, and Vincent Ciarlante (the plaintiffs), as representatives of a putative class of minority shareholders in B & O, brought this action challenging the merger. The complaint, which named as defendants B & O, C & O, and CSX, alleged civil RICO violations and breach of state law fiduciary duty. The district court dismissed the action under Fed.R.Civ.P. 12(b)(6), concluding that the complaint alleged neither a sufficient pattern of racketeering activity to state a civil RICO claim nor sufficient fraud to state a claim for breach of fiduciary duty under state law, 659 F.Supp. 824. We affirm.
 
 
 2
 * The facts alleged by the plaintiffs, which we must take as true for the purposes of ruling on this 12(b)(6) motion, are essentially as follows.
 
 
 3
 B & O is a Maryland railroad corporation in which the plaintiffs hold minority interests. Approximately 98.5% of the outstanding shares of B & O's common and preferred stock is owned by C & O, a Virginia corporation. C & O in turn is a wholly-owned subsidiary of CSX Corporation, a Virginia holding company that owns a number of transportation, real estate, and mining concerns in the eastern seaboard region. Through its ownership of C & O, CSX dominates and controls the operations and financial affairs of B & O and its subsidiaries.
 
 
 4
 Prior to 1977, B & O owned substantial non-rail assets, including a large amount of potentially profitable real estate. CSX wished to develop these non-rail assets free from the claims of B & O's minority shareholders. To accomplish that goal, CSX in 1977 directed B & O to transfer virtually all its non-rail assets to its wholly-owned subsidiary, Mid-Allegheny Corp. (MAC). Following this transfer, CSX distributed the MAC stock to B & O's common shareholders as a dividend-in-kind, without giving advance notice of the proposed dividend to the holders of debentures convertible into B & O common stock. The effect of this transaction was to deprive the B & O debentureholders, who counted among their number the representative plaintiffs, of the opportunity to convert before the record date and thereby to share in the anticipated profits from the development of B & O's non-rail assets.[1]
 
 
 5
 Over the next several years, CSX transferred most of MAC's non-rail assets to other CSX affiliates. Between 1978 and 1979, CSX directed MAC's board of directors, which it controlled, to approve the sale of much of MAC's real estate to other CSX affiliates, allegedly at prices below fair value. In February 1983, CSX directed MAC's board of directors to approve the sale of MAC's controlling interest in the Western Maryland Co. (WMC), a profitable timber and mineral leasing concern, to another wholly-owned subsidiary of CSX, CSX Minerals, Inc. (CSX-M). This sale was also allegedly at a price below fair value. CSX then carried out a merger of WMC into CSX-M, and in connection with this merger, sent WMC's shareholders a proxy statement which allegedly contained various fraudulent misrepresentations and omissions.
 
 
 6
 CSX then began to spin off B & O's rail assets. In February 1983, it directed B & O's board of directors, which it controlled, to approve the sale of B & O's controlling interest in the Western Maryland Railroad Company (WMR) to B & O's parent, C & O, at a price allegedly below fair value. Following the sale, CSX engineered a merger of WMR into C & O and, in connection with this merger, mailed WMR's shareholders a proxy statement which allegedly contained various misrepresentations and omissions. CSX also endeavored to depress B & O's earnings, by shifting certain costs incurred in other CSX subsidiaries to it.
 
 
 7
 Finally, CSX proposed to rid itself of B & O's minority shareholders altogether by merging B & O into its parent corporation, C & O. It is this proposed merger which the plaintiffs, whose interests it would cash out, challenge in this action. Because C & O owned more than 90% of the outstanding common stock of B & O, CSX was able to carry out the merger without securing shareholder approval, under Md.Corps. & Ass'ns Code Ann. Sec. 3-106. In connection with the merger, the plaintiffs allege that CSX made several false representations as to the value of B & O's assets, in order to induce them to accept less than the fair value of their stock as a cash-out price.
 
 
 8
 Shortly after the proposed merger was announced, the plaintiff minority shareholders filed actions against B & O, C & O, and CSX in both state and federal court. The state court complaint alleged essentially that the merger had no proper business purpose, that the price offered for the minority shares was grossly inadequate, and that C & O and CSX had breached the fiduciary duty they owed B & O's minority shareholders, as holders of the majority interest in B & O, by engaging in "unfair dealing, coercion, deception, manipulation, and gross and palpable overreaching tantamount to fraud." The complaint sought both injunctive relief against the merger and damages for the losses allegedly suffered by the plaintiffs as a result of it.
 
 
 9
 The amended federal complaint, which is the subject of this appeal, contains three counts. The first two counts attempt to state civil RICO claims under 18 U.S.C. Secs. 1962(c) and 1962(a). Both counts are based on allegations that the defendants conceived an elaborate scheme to deprive B & O's minority shareholders of their right to participate in the profits from B & O's growth through a series of complex corporate transactions spanning more than a decade, that they committed numerous acts of mail fraud in furtherance of this scheme, and that these acts constitute a "pattern of racketeering activity" under 18 U.S.C. Sec. 1961. The third count attempts to state a claim against C & O and CSX for breach of fiduciary duty under state law. Like its state counterpart, the federal complaint seeks both injunctive relief against the merger and damages based on it.
 
 
 10
 In early April 1987, the state court denied the plaintiffs' request for injunctive relief against the merger, finding the dispute to be essentially one over the value of the minority stock, which could adequately be dealt with in the statutory appraisal proceeding. The plaintiffs moved for leave to file an amended complaint setting out the allegations of fraud in greater detail. The state court denied this motion. The plaintiffs appealed to the Maryland Court of Special Appeals, which affirmed the denial of leave to amend, finding that even with the proposed amendments, the complaint failed to state a claim for relief under state law. Further appeal is now pending within the state court system.
 
 
 11
 On April 30, 1987, the merger was consummated, mooting the plaintiffs' request for prospective injunctive relief in this action. Shortly thereafter, the district court dismissed the federal action for failure to state a claim. The court reasoned that the first two counts of the amended complaint failed to allege a sufficient pattern of racketeering activity to state a civil RICO claim, and that the third count failed to allege the sort of fraud necessary to support a claim for breach of fiduciary duty under state law. This appeal followed.
 
 II
 
 12
 18 U.S.C. Sec. 1964 enables a private plaintiff to bring a civil action for treble damages based on a violation of Sec. 1962. In this case, the plaintiffs' complaint attempts to assert civil RICO claims under both Sec. 1962(c) and Sec. 1962(a). A crucial element of the claim under both sections is the existence of a "pattern of racketeering activity." The district court held that neither of the RICO counts here alleged a legally sufficient pattern of racketeering activity and dismissed on that ground. We agree.[2]
 
 
 13
 The RICO statute defines a "pattern of racketeering activity" simply as "at least two" acts of racketeering activity within ten years of each other. 18 U.S.C. Sec. 1961(5). Our current interpretation of this rather sparse statutory definition has its genesis in the Supreme Court's decision in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). There the Court rebuffed a movement then afoot in the lower courts to limit the scope of the civil RICO provisions by reading in restrictions that do not appear on the face of the statute, such as a requirement that the plaintiff have suffered a special "racketeering injury." At the same time, however, the Court suggested that lower courts might properly curb the abuse of civil RICO by more careful delineation of the "pattern" requirement. Id. at 500, 105 S.Ct. at 3287. Exploring the pattern concept in dicta, the Court suggested that while two acts of racketeering activity are necessary to form a pattern, they are generally not sufficient. Id. at 496 n. 14, 105 S.Ct. at 3285 n. 14. Because the legislative history indicates that RICO was not meant to target "sporadic" or "isolated" instances of racketeering activity, the Court said, predicate acts constitute a pattern only when they reflect both "continuity" and "relationship." Id., quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969), U.S.Code Cong. & Admin.News 1970, p. 4007.
 
 
 14
 Since Sedima, the lower courts have struggled to give content to the vague notions of "continuity" and "relationship" that are now considered the distinctive characteristics of the RICO "pattern." As the Seventh Circuit has remarked, see, e.g., Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir.1986), this task has not been an easy one, for the terms "relationship" and "continuity," as used in Sedima, are inherently contradictory. "Relationship" implies that the predicate acts were committed close together in time, involve the same victim or type of misconduct, or both; "continuity" implies more extended periods of time almost inevitably involving different victims. Id. An excessive focus on either factor in a given fact situation may effectively eliminate the other. Id.
 
 
 15
 Recognizing this conceptual tension, we held in International Data Bank v. Zepkin, 812 F.2d 149 (4th Cir.1987), that the existence of a RICO pattern must be determined on a case-by-case basis, rather than by reference to any set of mechanical rules. Id. at 154-55. Under this flexible standard, what constitutes a RICO pattern is thus "a matter of criminal dimension and degree," to be dealt with by reference to the facts and circumstances of each particular case. Id. at 155.
 
 
 16
 As Zepkin and the cases following it illustrate, it is the continuity aspect of Sedima 's pattern analysis which has given us the greatest difficulty in application. We are not alone in this regard--the proper application of the continuity prong has bitterly divided the circuits. The Eighth Circuit has held that the continuity necessary to establish a pattern is not present when the predicate acts alleged were all committed in furtherance of a single continuing scheme. See, e.g., Superior Oil Co. v. Fulmer, 785 F.2d 252, 257 (8th Cir.1986). The Second and Eleventh Circuits, by contrast, have focused solely on the number of related predicate acts, without regard to the existence of separate "schemes." See, e.g., United States v. Ianniello, 808 F.2d 184, 189-93 (2d Cir.1986); Bank of America v. Touche Ross & Co., 782 F.2d 966, 970-71 (11th Cir.1986). The Seventh Circuit has taken a middle stance, holding that related predicate acts may reflect sufficient continuity to establish a pattern, even if they can be characterized as part of a single scheme, if they are "ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, i.e., 'transactions "somewhat separated in time and place." ' " Morgan, 804 F.2d at 975 (quoting Graham v. Slaughter, 624 F.Supp. 222, 225 (N.D.Ill.1985) (quoting United States v. Moeller, 402 F.Supp. 49, 57-58 (D.Conn.1975))). In making this determination, the Seventh Circuit has looked to the number and variety of the predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. Id.
 
 
 17
 In Zepkin, we adopted a flexible approach to the continuity inquiry not unlike that enunciated by the Seventh Circuit in Morgan. We agreed that the mere fact that the predicate acts alleged can properly be characterized as part of a single ongoing "scheme" should not automatically prevent them from constituting a pattern. 812 F.2d at 155. On the other hand, we recognized that a "single, limited scheme" designed to perpetrate a single fraud should not be transformed into a RICO violation simply because the fraud's commission required several acts of mail or wire fraud; such an interpretation would, we thought, virtually read the pattern requirement out of the statute, for it is "the unusual fraud that does not enlist the mails and wires in its service at least twice." Id. at 154-55. We did not attempt to identify a range of factors relevant to the continuity inquiry, as had the Seventh Circuit in Morgan. But we did indicate that the inquiry ought to focus on whether the related predicate acts suggested "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." Id. at 155.
 
 
 18
 The complaint in Zepkin alleged that the defendants had committed multiple acts of securities fraud by issuing a misleading prospectus to ten investors in connection with a single stock offering. We found this insufficient to satisfy the continuity aspect of the pattern requirement because the predicate acts alleged were all designed to perpetrate a single fraud. Id. at 154-55. As we later explained, the multiplicity of the predicate acts in Zepkin was more a reflection of the nature of the underlying transaction--a securities deal which produced numerous pieces of paper--than of the scope and persistence of the criminal activity involved. See HMK Corp. v. Walsey, 828 F.2d 1071, 1974 (4th Cir.1987) (quoting Morgan, 804 F.2d at 976). Predicate acts must be viewed in context, we stressed; the mere fact that a particular transaction generates numerous pieces of paper--and hence the potential for a greater number of related predicate acts--does not necessarily mean that those predicate acts in combination pose a special threat to social well-being. Id.; see Morgan, 804 F.2d at 976.
 
 
 19
 In HMK Corp. v. Walsey, 828 F.2d 1071 (4th Cir.1987), we took the analysis a step further. There the complaint alleged that the developer defendants had made a series of misrepresentations to government officials in order to influence zoning decisions regarding a certain tract of land. Unlike the predicate acts in Zepkin, which occurred close together in time and were related to a single transaction, these predicate acts spanned a period of four years and could be grouped into several distinct "episodes" of activity somewhat separated in time and space. For this reason, the plaintiffs argued that the predicate acts reflected the continuity necessary to make out a pattern. In rejecting this argument, we again emphasized the importance of context. On the facts of that case, we thought both the number of predicate acts and the length of time they spanned to be more a reflection of the peculiar context in which they had occurred--a protracted zoning dispute that required the involvement of many different governmental decisionmakers--than of criminal activity that posed a special threat to social well-being. Id. at 1074-76. We emphasized that the determination of whether particular predicate acts reflect "continuous" criminal activity cannot be made in a vacuum, but must take into account the inherent characteristics of the situation in issue. Id. at 1075.
 
 
 20
 This case presents the closest question yet, for the predicate acts alleged here span a period of ten years and can be grouped into several distinct "episodes" of activity, each of which is arguably self-contained. Indeed, the plaintiffs contend that these different "episodes" of fraudulent activity reflect the existence of at least four separate and distinct "schemes." The first such "scheme" is said to involve the 1977 transfer of B & O's non-rail assets to MAC and the subsequent declaration of the dividend in MAC stock without advance notice to the B & O debentureholders. The second and third "schemes" involve the 1983 freezeouts of the minority shareholders in two B & O subsidiaries, WMR and WMC; the fourth centers around the current effort to freeze out the minority shareholders in B & O itself. See Appellant's Brief at 5-7. The plaintiffs contend that the existence of these separate "schemes" demonstrates the continuity necessary to make out a RICO pattern.
 
 
 21
 We disagree. Even assuming that the allegations made here are legally sufficient to plead multiple acts of mail fraud--an issue we do not decide--we are not persuaded that the conduct thus alleged reveals sufficient continuity to establish a pattern, as that concept has been worked out in our cases. As the district court noted--and the plaintiffs' own complaint asserts repeatedly[3]--each of these allegedly separate "schemes" or "episodes" of fraudulent activity was merely another step toward the accomplishment of a single, limited goal: getting rid of the outside minority interests in B & O. There was in reality but a single "scheme" to inflict a single basic injury. Here, as in HMK, the number of predicate acts and the length of time over which they occurred are more a reflection of the peculiar context in which the activity occurred--a lengthy and bitter battle for control of a large corporate entity--than of ongoing criminal conduct whose scope and persistence poses a special threat to social well-being. Virtually every action taken by a controlling majority in the course of its stewardship of a corporation is subject to challenge as either mail or securities fraud. To hold indiscriminately that proof of several such acts occurring over the course of a period of years constitutes a RICO pattern would be to make the statute's extraordinary penalties available to virtually every disgruntled minority shareholder harmed in the process. Such a result would not only have a chilling effect on the transaction of legitimate corporate business, but also sanction a use of the RICO statute that we do not think Congress intended.
 
 
 22
 We do not, of course, mean to suggest that a single ongoing scheme of racketeering activity can never constitute a pattern when it occurs in the corporate context. Indeed, one of the most obvious examples of a RICO pattern--a scheme that involves setting up a series of shell corporations, selling stock in them by means of various false representations, and then disappearing with the proceeds--occurs in the corporate context. Such an open-ended scheme contemplating the repeated infliction of independent economic injuries on an indiscriminate number of victims may well pose a special threat to social well-being. We hold only that this particular scheme, limited in scope to the accomplishment of a single discrete objective--forcing out the minority in a single corporate structure--does not pose a sufficient threat of continuing criminal activity to justify imposition of RICO's extraordinary penalties. Though the activity engendered by this scheme was spread out over time, it was undertaken merely as a means to the accomplishment of that single end, and there is nothing to suggest that it would have continued for a moment longer than was necessary to accomplish it. Viewed in context, the separate acts emerge as no more deleterious than the multiple mailings in furtherance of the single discrete transaction in Zepkin. Such allegations of multiple preparatory acts leading up to the infliction of a single basic injury are simply not the stuff of which RICO patterns are made. See, e.g., finding similar allegations insufficient to meet Sedima's continuity requirement, Medical Emergency Serv. Assoc. v. Foulke, 844 F.2d 391 (7th Cir.1988) (multiple acts of mail fraud leading up to infliction of single injury, the displacement of plaintiff as provider of emergency services); Marks v. Pannell Kerr Forster, 811 F.2d 1108, 1110-12 (7th Cir.1987) (multiple fraudulent acts designed to inflict single injury on single victim); Skycom Corp. v. Telstar Corp., 813 F.2d 810, 818 (7th Cir.1987) (multiple fraudulent representations leading up to formation of single contract and transfer of single business opportunity); Torwest DBC, Inc. v. Dick, 810 F.2d 925, 928-29 (10th Cir.1987) (allegations of multiple fraudulent acts designed to permit corporate insiders to recover illegal profits from sale of single piece of property); Elliott v. Chicago Motor Club Ins., 809 F.2d 347, 349-50 (7th Cir.1986) (multiple acts of mail fraud designed to defraud plaintiff in relation to single insurance claim); see also Montesano v. Seafirst Comm. Corp., 818 F.2d 423, 426 (5th Cir.1987) (Higginbotham, J.) (suggesting similar analysis).
 
 
 23
 We wish to emphasize that by focusing on the ultimate objective of the related predicate acts at issue, we are not holding that it is necessary to show more than one fraudulent "scheme" or criminal "episode" to establish a pattern. Such an approach is, in our judgment, utterly indefensible after Sedima, for the RICO statute itself contains no requirement of multiple "schemes" or "episodes." Nor do we mean to suggest that related predicate acts may always avoid RICO liability by the "semantical game of generalizing the[ir] illegal objective." See Montesano, 818 F.2d at 426. Quite plainly, a scheme that contemplates the repeated infliction of independent economic injuries--e.g., a series of bank robberies or embezzlements--should not escape characterization as a pattern simply because each criminal act shares the same general objective--the robbing of banks or the embezzlement of funds. Schemes such as these, which involve the repeated infliction of independent economic injuries--and thus the reaping of independent illegal benefits--are precisely the sort of ongoing criminal activity to which Sedima 's continuity requirement is addressed. See, e.g., Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1303-05 (7th Cir.1987) (allegations that defendants mailed 19 different false shipping invoices over period of seven months to document shipments that were never made were sufficient to satisfy continuity requirement, because each false invoice was a separate fraud resulting in an independent economic injury and concomitant illegal benefit); Illinois Dept. of Revenue v. Phillips, 771 F.2d 312, 313 (7th Cir.1985) (allegations that defendant mailed nine separate fraudulent sales tax returns to the state over a nine-month period were sufficient to constitute pattern). We hold only that the objective of the related predicate acts is a factor to be considered in assessing the criminal dimension and degree. In this case, that objective is sufficiently limited that we cannot say the related predicate acts suggest ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being.
 
 III
 
 24
 We turn next to Count III of the amended complaint, which attempts to assert a claim for breach of fiduciary duty under state law. Under Maryland law, a minority shareholder who objects to the price offered him by the majority in a Sec. 3-106 merger may elect instead to receive the fair value of his stock through the appraisal process set forth in Md.Corps. & Ass'ns Code Ann. Secs. 3-201 to -213. Md. Corps. & Ass'ns Code Ann. Sec. 3-106(d)(2). The statute itself does not indicate whether this appraisal proceeding is the exclusive remedy available to a dissenting minority shareholder in a Sec. 3-106 merger. Maryland's highest court has not specifically addressed this issue, but it has indicated that minority shareholders may, under certain circumstances, obtain equitable relief against similar "freezeout" maneuvers, notwithstanding the existence of the statutory appraisal remedy. See Lerner v. Lerner, 306 Md. 771, 511 A.2d 501, 505-06 (1986); Homer v. Crown Cork & Seal Co., 155 Md. 66, 141 A. 425, 432 (1928); see also Twenty Seven Trust v. Realty Growth Investors, 533 F.Supp. 1028, 1034-36 (D.Md.1982) (applying Maryland law). Drawing on these precedents, Maryland's intermediate appellate court has recently held that dissenting minority shareholders may, under certain limited circumstances, obtain equitable relief against a Sec. 3-106 freezeout merger, despite the existence of the statutory appraisal remedy. Walter Schloss Assoc. v. The Chesapeake & Ohio Ry., 73 Md.App. 727, 536 A.2d 147, 157-58 (Md.Ct.Spec.App.1988). While the Schloss decision is of course not binding on us, we think it represents the best available prediction of the position the Maryland Court of Appeals would likely take on the issue. We therefore assume, as did the district court, that Maryland law permits a dissenting minority shareholder to obtain equitable relief against a Sec. 3-106 freezeout merger, in certain circumstances.
 
 
 25
 Identifying the circumstances under which such relief is available, however, is a much more difficult task. In Homer, the Court of Appeals held that an allegation that the price offered for minority shares was "grossly inadequate" would not justify equitable relief because such a claim could be fairly resolved in the statutory appraisal proceeding. 141 A. at 432. Equitable relief was warranted, the court held, only where there was "fraud" on the part of the majority or the officers and directors it controlled. Id. But the Homer court recognized that allegations of "fraud" are often nothing more than disagreements about methods of valuation, which are more appropriately resolved in the statutory appraisal proceeding. It therefore directed courts to view allegations of fraud with suspicion and to deny equitable relief "if, on consideration of all the allegations of the bill of complaint, it appear[s] that the fundamental issue thus made is not fraud, but a debatable controversy over value." Id. To take the case out of the appraisal statute, the court held, the fraud must be "affirmatively shown." Id. Applying this careful scrutiny to the allegations of fraud in the complaint before it, the court found them to be in essence nothing more than a complaint about the method by which the value of the minority shares was calculated. Since this dispute could adequately be resolved in a statutory appraisal proceeding, the court found the allegations insufficient to state a claim for equitable relief. Id. at 433-34.
 
 
 26
 Homer was decided in 1928, and the general body of corporate law has changed a great deal in the intervening years. During the 1970s, many courts held that minority shareholders could obtain equitable relief against freezeout mergers upon a showing that the merger had no legitimate "business purpose" other than to force out the minority. See, e.g., Singer v. Magnavox Co., 380 A.2d 969, 980 (Del.1977). In Weinberger v. UPO, Inc., 457 A.2d 701 (Del.1983), the Delaware Supreme Court abandoned this "no independent business purpose" rule and held that a minority shareholder could obtain equitable relief against a freezeout only upon a showing that the transaction did not meet the test of "entire fairness." "Entire fairness," said the Delaware court, meant both "fair dealing" and "fair price," id. at 711; for this reason, equitable relief might be appropriate not only in cases of actual fraud, but also where the majority had engaged in "misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching," id. at 714. It is this broad "fairness" exception to the exclusivity of the statutory appraisal remedy, rather than the narrow "actual fraud" exception recognized by the Maryland Court of Appeals in Homer, that the plaintiffs urge us to apply in judging the sufficiency of their complaint.
 
 
 27
 We decline to do so. Three years after Weinberger, the Maryland Court of Appeals was asked to adopt its "fairness" approach to minority freezeouts in an appeal from the grant of a preliminary injunction against such a merger. See Lerner, 511 A.2d at 511.[4] It specifically declined to decide whether to do so, saying that such a decision involved "serious, substantial, difficult and doubtful" issues that would require "more deliberate investigation." Id. At the same time, the Court of Appeals specifically reaffirmed Homer 's holding that equitable relief was not available to a minority shareholder when careful analysis of his complaint revealed it to be nothing more than a complaint about the adequacy of the price offered for his shares. Id. at 506. Because the Weinberger issue was presented to the Maryland court in the preliminary injunction context, its refusal to adopt that doctrine cannot be taken as an affirmative indication that it would not do so, upon further reflection. Absent more authoritative guidance from the state's highest court, however, it is not for this court, sitting in diversity, to extend state law in the manner suggested. Accordingly, it is Homer 's actual fraud rule, rather than the Weinberger "general fairness" test, that we apply in judging the sufficiency of this complaint.
 
 
 28
 Viewing the plaintiffs' attempted allegations of "fraud" with the suspicion mandated by Homer, and under the stringent pleading requirement of Fed.R.Civ.P. 9(b), we are convinced, as was the district court, that they are not sufficient to state a claim for equitable relief under existing Maryland law. Paragraphs 55-70 contain various complaints about income and asset valuations and methods of accounting, which are, as indicated earlier, insufficient to warrant equitable relief under Homer. Paragraph 71 alleges that the defendants "concealed from the investing public material information concerning B & O in order to manipulate and control the price ... of the B & O common stock." Specifically, paragraph 71a alleges that the defendants failed to disclose B & O's plans to sell one or more of its short-line railroads; paragraph 71b that they failed to disclose B & O's projections of income for 1986 and 1987, and that they waited until March of 1987 to disclose B & O's 1986 earnings, though the information was available in January. None of these allegations is sufficient to plead a case of fraud under Maryland law and Fed.R.Civ.P. 9(b), for all of this information was fully disclosed to the B & O shareholders in the notice of merger, and there are no specific facts alleged that show the failure to disclose it earlier affected the market price of B & O's stock or otherwise caused the plaintiffs injury.[5]
 
 
 29
 Paragraph 72 alleges that the defendants concealed until the merger was announced that Morgan Stanley, which CSX retained as an "independent financial advisor" to provide the appraisals of B & O's common stock used to calculate the cash-out price, had had previous business dealings with CSX, including underwriting CSX offerings and maintaining a trading position in CSX stock. But there is no specific allegation that these prior business dealings prevented Morgan Stanley from exercising independent business judgment in this case, and it is, in any event, undisputed that the prior dealings were fully disclosed to the minority shareholders in the notice of merger. These conclusory allegations of bias are simply insufficient to make out the concrete case of fraud required by Homer.
 
 
 30
 In sum, we think a fair reading of the complaint as a whole reveals the plaintiffs' fundamental grievance to be one of inadequate price, rather than fraudulent dealing. Because the statutory appraisal remedy provides a wholly adequate--and in these circumstances exclusive--remedy for price inadequacy, we agree with the district court that the third count of the complaint fails to state a claim upon which relief can be granted. We are bolstered in this conclusion by a recent decision of the Maryland Court of Special Appeals in the parallel state court litigation challenging this same merger. See Walter J. Schloss Assoc. v. The Chesapeake & Ohio Ry., 73 Md.App. 727, 536 A.2d 147 (Md.Ct.Spec.App.1988). The plaintiffs in Schloss are represented by the same counsel as the plaintiffs in this case, and the allegations in their complaint are in all material respects the same as those in the complaint now before us.[6] The Maryland court found these allegations insufficient to state a claim for equitable relief under Homer, and we think the same analysis applies here.
 
 IV
 
 31
 For the foregoing reasons, the judgment of dismissal is affirmed.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 The plaintiffs also allege that between 1961 and 1978, CSX and C & O tricked large numbers of B & O debentureholders into selling their debentures to B & O at less than face value, by directing B & O not to pay dividends on its common stock
 
 
 [2]
 On appeal, the defendants argue that the dismissal of the civil RICO counts may also be upheld on several other grounds not reached by the district court: (1) failure to allege with sufficient particularity at least two predicate acts of racketeering activity; (2) failure to allege an "enterprise" separate and distinct from the "persons" who committed the alleged RICO violations; (3) failure to allege an adequate nexus between the persons, the enterprise, and the alleged pattern of racketeering activity; (4) failure to allege injury to business or property as a result of the alleged RICO violations; and (5) that the plaintiffs, as individual shareholders, lack standing to sue because any injuries they suffered were merely derivative of the injury to the corporation itself. Because we agree with the district court that the allegations in the complaint, even if true, would fail to establish a pattern of racketeering activity, we do not address the other grounds for dismissal advanced by the defendants
 
 
 [3]
 See Joint Appendix 3A-4A; 7A; 35A
 
 
 [4]
 While the court was asked to do so by a majority shareholder who sought to avoid the business purpose doctrine, the court's discussion made clear that it was considering all aspects of the Weinberger rule. See 511 A.2d at 511
 
 
 [5]
 The plaintiffs' conclusory allegations that the information concealed was relevant to the market's valuation of the B & O stock, see p 71a, is insufficient to plead fraud under Rule 9(b)
 
 
 [6]
 We have considered carefully the differences between the two complaints pointed out by the plaintiffs and find them to be inconsequential