**Joe B. SELMAN, Plaintiff,**

v.

**AMERICAN SPORTS UNDERWRITERS, INC., et al., Defendants.**

**Civ. A. No. 84–0099–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

Oct. 4, 1988.

John K. Taggart, III, Kevin P. Roddy, Charlottesville, Va., for plaintiff.

G.H. Gromel, Jr., Hunton & Williams, Richmond, Va., for Lockwood, Dipple & Green Inc., E.A. Dipple, S.J. Lockwood and J.R.D. Green.

Jay T. Swett, McGuire, Woods & Battle, Charlottesville, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

*Procedural History*

The plaintiff, Joe B. Selman, initiated this action by filing suit on December 20, 1984. Selman's original complaint asserts that all of the defendants: 1) violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and 2) committed civil conspiracy under Virginia Code § 18.2–499, –500. The complaint also charges Mr. Eshelman and American Sports Underwriters, Inc. with breach of employment contract, and tortious interfer-ence with the plaintiff's prospective economic relations.

On March 14 and 15, 1985, all of the defendants filed motions to dismiss the complaint. After considering those portions of the various motions bearing on the plaintiff's RICO claim, this court, by Order dated March 23, 1987, found that the plaintiff had not made out the requisite showing that the defendants had engaged in any criminal activity; thus, it dismissed Count I against all of the defendants.

On February 27, 1986, the plaintiff moved for leave to file an amended complaint. The amended complaint contained amendments which can be broken down into the six following categories: 1) a new defendant was added; 2) allegations regarding the organization, ownership and relationships between the individual and corporate defendants were added; 3) the statement of facts was expanded to include matters learned to that point in discovery; 4) the plaintiff added a claim for relief under § 1962(a) of the RICO Act; 5) allegations regarding predicate acts of mail fraud and wire fraud were expanded; and 6) new predicate acts involving violations of the Federal Travel Fraud Act, 18 U.S.C. § 2314 (1982), were added. On March 27, 1987, all of the defendants filed renewed motions to dismiss or motions for summary judgment as to the plaintiff's remaining state law claims, asserting defective service of process, improper venue, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted.

On October 30, 1987, this court held a hearing on the plaintiff's motion to amend the complaint and on the defendants' renewed motions to dismiss the original complaint. While these motions were under advisement the court was informed that the Virginia Supreme Court had recently decided a case relevant to the issues presented in the respective motions. Consequently, by Order date January 15, 1988, this court permitted the parties to supplement the record by submitting briefs on the applicability of that case, *Kay Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915 (1987), to the issues raised in Count III of

the plaintiff's complaint. All matters now having been fully briefed and argued, all present motions in this case are ripe for disposition, and are resolved in this opinion *infra*.

*Statement of Facts*

Plaintiff alleges the following facts, which for purposes of deciding the present motions, the court accepts as true and views in the light most favorable to the plaintiff. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The defendant, American Sports Underwriters ("ASU") is a Massachusetts corporation engaged in the business of developing, marketing, and brokering insurance policies in the field of professional and collegiate sports. In the summer of 1984, defendants Edward A. Dipple, Stephen J. Lockwood, and Peter T. Eshelman served as chairman of the board, secretary-treasurer, and president, respectively, as well as being members of the Board of Directors of ASU. At that time defendant John R.D. Green was also a member of the Board of Directors of both ASU and Lockwood, Dipple, and Green, Inc. ("LD & G"). In July, 1984, Eshelman and LDG Management Corporation ("LDGM") were the sole owners of ASU stock.[1] Selman was hired in November of 1983 pursuant to a contract with ASU to establish, develop, and sell sports insurance to the college market. The complaint alleges that the individual defendants, all of whom were officers of ASU, conspired in late July of 1984 to terminate Selman's employment contract in violation of the terms of that contract.

Although the plaintiff's original complaint contains a statement of facts which consumes 102 typed pages of text, the facts at issue, as asserted by the plaintiff, can be capsulized as follows: (1) although ASU's college division, which Selman headed, was experiencing significant losses, Selman nevertheless was instrumental in causing the National Collegiate Athletic Association ("NCAA") to select ASU in mid-July

of 1984 to develop certain insurance plans, including a catastrophic medical plan ("Cat Med"); (2) the NCAA's decision could have resulted in large profits for ASU in the latter part of 1985 and beyond; (3) the NCAA's selection of ASU in July caused the directors of ASU, at their meeting on July 23, 1984, to enter into a conspiracy to fire Selman in order to deprive him of future commissions and the equity interest in ASU called for in his employment contract; (4) as part of the conspiracy, the directors avoided telling Selman that he would be fired in an effort to lead him on and to obtain further work product from him; (5) at the opportune time, presumably when the risk of losing the NCAA business was minimal, the directors of ASU planned to consummate the conspiracy and thereby fire Selman in contravention of the terms of his employee contract. A fuller summary of the facts is presented in the following paragraphs.

Prior to his dealings with the defendants, Selman was an independent insurance agent with an office located in Charlottesville, Virginia. Selman had brokered insurance contracts between the defendant insurance businesses and various professional and college athletes, and he had negotiated possible insurance contracts for college sports programs. For purposes of the instant motions only, the court will accept the plaintiff's allegation that defendant ASU was an affiliate company of defendant LD & G and was devoted exclusively to sports insurance, with underwriting on behalf of State Mutual Life Insurance Company, located in the United States. The plaintiff also, as an independent insurance agent, negotiated for the sale of an NCAA Cat Med insurance program on behalf of ASU. As part of his duties as an independent agent, Selman visited the headquarters of LD & G in London, England, to discuss various insurance programs which the defendants hoped to market through Selman.

---

1. LDGM is a Massachusetts corporation which was organized in December, 1983, to serve as a stockholding company for affiliated operating companies, including ASU and DLBG. In the summer of 1984, Mr. Dipple, Mr. Lockwood,

and Smith Bromfield Services, Inc. were the sole LDGM shareholders. At that time, Mr. Dipple, Mr. Lockwood, and Steve Hurwitz were the president, executive vice-president, and secretary, respectively, of LDGM.

By letter dated November 8, 1983, Eshelman offered Selman the position of vice-president in the newly established College Division of ASU ("ASU/CD"), whose office would be located in Charlottesville, Virginia. This letter recites the crux of the contractual obligations which Selman asserts were entered into between the parties. Selman was to be vice-president of ASU/CD, responsible for the development, marketing, administration, and production of college business. ASU agreed to fund the College Division with $120,000 over the course of one year. It was anticipated that ASU/CD would incur expenses in the amount of $150,000 for the first year, and ASU agreed to pay all bills for the new College Division.

The letter also contained a commissions split, and concluded that:

> After one year of profitable business trading, including make-up of any accumulations of losses in prior years, ASU will offer Joe Selman an equity interest to be established by the ASU Board of Directors.

The letter does not include any date of expiration for the agreement. Selman was to develop college sports insurance policies and market those policies to colleges and universities; however, he lacked any underwriting authority. Throughout the early part of 1984, it is apparent that there were some difficulties in completing insurance programs so that they would then be ready for Selman to market them. There is some dispute among the parties as to whether Selman or ASU was to complete the basic insurance product to be further developed by the College Division; however, Selman himself testified in his deposition that his purpose was to "get the ball rolling ..." (Selman deposition, p. 99–100). As early as February, 1984, there were some difficulties between Selman and Eshelman over certain expenses which ASU denied, culminating in rather heated discussions.

Taking the plaintiff's view of the completion dates, permanent total disability ("PTD") insurance was ready for sale in February, 1984, and a "Grant-in-Aid" scholarship insurance package was ready for

sale as of March, 1984. According to the plaintiff, these completion dates came too late for most colleges to purchase the packages for that year, since a purchase of that size must be approved in advance by the various budget committees in the colleges. Selman also attempted to obtain NCAA Insurance Committee endorsement of these two programs but was unsuccessful. Selman continued to expend funds in marketing the programs and did make a few sales, but the College Division was not profitable.

Selman also attempted to market a Cat Med insurance policy to the NCAA. This policy was anticipated by all parties to this litigation to be an immensely profitable venture. Apparently, NCAA endorsement of an insurance program virtually assures that a great number of colleges will purchase the program. On July 10, 1984, the NCAA Insurance Committee announced that it intended to pursue ASU's proposal for Cat Med insurance, which all parties agreed meant that a forthcoming NCAA endorsement was a virtual certainty. Thus, Selman was directed to move forward on formulating and finalizing other insurance products.

On July 23, 1984, the board of directors of ASU met, including defendants Eshelman, Dipple, Lockwood, and Green. The minutes of the meeting reflect concern over the losses in the College Division which had no immediate prospects of breaking even. The directors considered changing Selman to a broker rather than an employee, in part to reward him for his contribution in producing the NCAA business for ASU.

Defendant Eshelman met Selman on July 27, 1984, and outlined a cost-cutting program for the College Division. In a handwritten memo outlining Eshelman's proposals, which was later typewritten and mailed to the plaintiff, Eshelman noted that:

> If at expiring of [sic] October, 1984, monthly expenses have not been met and there is no apparent hope for the bottom line to turn around, ASU/CD Charlottesville will cease operations and resume activity in Boston.... If I feel Joe has given his best effort during the next

three months and failed, ASU will continue to provide office space and Joe's salary until 12/31/84 in an effort to help Joe make the transition back to being a broker and sole proprietor. ASU and Joe may continue a business relationship on a Broker/Market basis as designated by ASU.

. . . .

If business is produced over the next three months we will all be pleased and look forward to the success of the College Division operating out of Charlottesville.

(Plaintiff's brief appendix, p. 113). From this memo it is apparent that Selman was warned that despite the apparent future success of the NCAA endorsement, the College Division must return some semblance of a profit or his status as an employee would be terminated. Nonetheless, Selman believed that he was to continue marketing the NCAA Cat Med plan, allegedly at the urging of the defendant, Dipple.

At this point, feeling uncertain as to the directions stated by his superiors, Selman began tape recording his conversations with ASU representatives. For purposes of these motions only, the defendants have been willing to assume the accuracy and admissibility of the telephone transcripts plaintiff has produced from these tapes. Selman also testified that a September 4, 1984, meeting in Boston with defendants Dipple and Eshelman, NCAA representatives, and State Mutual personnel resulted in confirmation from all parties that he was to head up the NCAA plan.

During this period of time, Selman alleges that Eshelman continued to encourage him, stating that "for the month you lost $1,000, that was your best month ever," (Selman deposition exhibit 49B). In argument, the plaintiff stressed that Eshelman continued his encouragement and assured Selman of his future in the College Division, yet at the same time plaintiff admits that Eshelman continued to offer alternative options, including Selman's relocation to the Boston office, relocating the College Division to his home, or becoming a broker. (Selman deposition exhibit 53B). During October, 1984, Eshelman suggested further cost-cutting measures including the relinquishment of Selman's company car during the lean months.

An October 23, 1984, meeting was scheduled in Boston to evaluate the future of ASU/CD. On the evening before the meeting, Selman and Eshelman met and exchanged documents concerning their evaluation of the future. Eshelman's document noted the losses were much more extensive than projected, calling ASU/CD a "financial disaster". He also noted the potential success of the NCAA business. Eshelman anticipated that ASU would fund the College Division at only $5,000 per month, for a maximum of two months in 1985, at which time a failure of the Division to be profitable would result in its termination. Selman, on the other hand, submitted a document projecting a possible profit of $120,000, which would recover all accumulated losses, except approximately $20,000. Selman proposed that he receive forty percent of all net commissions and ownership of fifty percent of the capital stock of the College Division, which would be incorporated. Alternatively, he described a brokerage arrangement, which would "have to be exclusive and ... of sufficient duration to warrant my investment...." (Plaintiff's brief appendix pp. 161–64).

At the October 23, 1984, meeting, both Lockwood and Eshelman were upset that Selman had asked for a stock distribution. During very heated debate, Selman was offered a position at the Boston office by Lockwood, which Selman promptly accepted, but Eshelman reacted so violently that the offer was subsequently withdrawn. It became clear, however, that both the College Division and Selman were to be terminated. Nevertheless, Selman was still expected to travel the next day to meetings with NCAA officials, although he was requested not to inform them of his termination. Selman's proposal of an exclusive brokerage arrangement was denied, but it was suggested that a letter from the NCAA naming Selman as an "agent of record" might accomplish that end.

After the meeting Selman discovered, on a secretary's desk, a memo written by ASU's comptroller which stated that "Per PTE [Eshelman] any additional premiums of installments effective 1/1/84 or later on Policies written by Joe Selman (000950) prior to his association with [ASU] will show zero percent Broker's Commission." (Plaintiff's brief appendix p. 171). Selman offers this memo as evidence that ASU, through Eshelman, showed bad faith in its dealings with him.

At the NCAA meeting Selman disclosed the fact of his termination. In his formal termination letter, dated October 26, 1984, Selman's shortcomings as an underwriter were cited as a reason for the termination of the Division, but ASU offered to continue a non-exclusive brokerage relationship and offered severance pay to aid in his re-establishment as a broker. Selman commenced this action on December 20, 1984, and, allegedly because of the instant litigation, no severance pay was, in fact, ever paid.

*The Plaintiff's Motion to Amend His Complaint*

As noted, *supra,* the plaintiff has filed a motion for leave of this court to file an amended complaint. The amended complaint contains amendments which can be broken down into the six following categories: 1) a new defendant (LDG Management Group) was added; 2) allegations regarding the organization, ownership and relationships between the individual and corporate defendants were added; 3) the statement of facts was expanded to include matters learned in discovery; 4) the plaintiff added a claim for relief under § 1962(a) of the RICO Act; 5) allegations regarding predicate acts of mail fraud and wire fraud were expanded; and 6) new predicate acts involving violations of the Federal Travel Fraud Act, 18 U.S.C. § 2314 (1982), were added.

In determining whether the plaintiff should be permitted to file his amended complaint the court is governed by Rules 15 and 19 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 15(a) reads as follows:

Amendments. A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be longer, unless the court otherwise orders.

Rule 19, which governs the joinder of parties, allows the addition of parties by order of the Court on motion of any party or of its own initiative at any stage of the action. Fed.R.Civ.P. 19(a). Plaintiff concedes that he must obtain leave of the court in order to add another party by amendment of the complaint. *See, Age of Majority Educational Corp. v. Preller,* 512 F.2d 1241, 1246 (4th Cir.1975); *Sachs v. Snider,* 631 F.2d 350 (4th Cir.1980).

The plaintiff's amended complaint can be divided into two separate categories: 1) sections 1–3 add another defendant and supplement the record with information learned through discovery, 2) sections 4–6 (¶¶ 62–84) seek to resurrect the plaintiff's original RICO claim. The court has already carefully considered this claim, found it insufficient, and therefore dismissed it. The court finds nothing in the proposed amendments which would warrant the revival of the RICO claim.

A critical element in a civil RICO claim is the existence of a pattern of racketeering activity. The RICO statute defines a "pattern of racketeering activity" simply as "at least two" acts of racketeering activities within ten years of each other. 18 U.S.C. § 1961(5). In the recent case of *Walk v. Baltimore & Ohio Railroad,* 847 F.2d 1100 (4th Cir.1988), the Fourth Circuit addressed the much-debated question of when a sin-

gle fraudulent scheme may constitute a pattern of racketeering activity pursuant to the RICO statute. While the Fourth Circuit emphasized that its holding should not be interpreted as a pronouncement that a single scheme could never satisfy RICO's pattern requirement, the court held that the particular scheme at issue, limited in scope to the accomplishment of a "single discrete objective," did not pose a sufficient threat to justify the imposition of RICO's extraordinary penalties. *Id.* at 1105. The court explained that though the activity engendered by the scheme was spread out over time, it was undertaken merely as a means to the accomplishment of that single end, and there was nothing to suggest that "it would have continued a moment longer than necessary to accomplish it." *Id.* The separate acts alleged by the plaintiff in *Walk* were thus no more than "multiple mailings in furtherance of a single discrete transaction" as in *International Data Bank v. Zepkin,* 812 F.2d 149 (4th Cir. 1987). The court concluded that "such allegations of multiple preparatory acts leading up to the infliction of a single basic injury are simply not the stuff on which RICO claims are made." *Id.*

■ The court finds the Fourth Circuit's recent comments in *Walk* particularly helpful as it once again attempts to evaluate the viability of the plaintiff's RICO claim. At bottom, the plaintiff has alleged nothing more than an attempt by the defendants to breach the plaintiff's employment contract. This improper breach was the single, discrete objective of the defendant's alleged scheme. The plaintiff's argument that RICO's pattern requirement is satisfied by the defendant's preparatory acts leading up to the basic injury provided by the breach is misguided as it is clearly contrary to the holding of the Fourth Circuit in *Walk*. In short, the court finds that the acts of the defendants, as alleged by the plaintiff, are, in the words of the Fourth Circuit, "simply not the stuff of which RICO patterns are made." *Id.* Given these circumstances, the court shall deny the plaintiff's motion for leave to file the amended complaint as it pertains to any renewal of his dismissed RICO claim (i.e. sections 4–6, ¶¶ 62–84).

*See,* 6 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1487, at 432–33 (1971).

■ As to sections 1–3, the amended complaint contains amended factual allegation which may bear on Counts II, III, and IV of the complaint, claims which remain before the court. The court is of the opinion that an amendment of the complaint as to these matters has not been advanced in bad faith nor will it unduly prejudice the defendants in defending against the plaintiff's causes of action. Following the dictates of Fed.R.Civ.P. 15, that leave to amend "shall be freely given," the court shall permit the amendment of plaintiff's complaint only as it pertains to the new defendant and to information learned through discovery (i.e., sections 1–3).

Before turning to the merits of the defendants' motions to dismiss, the court notes that, to this date, the court has limited discovery in this action pursuant to its June 5, 1985, pre-trial order. In that order the court stated that, until discovery on the bad faith issue was completed and the court had ruled on the plaintiff's RICO claim, discovery was to be limited to the issue of the defendants' bad faith. Discovery on the issue of bad faith was extended an additional 120 days from the date of an order of this court of September 10, 1985.

*The Defendants' Renewed Motions to Dismiss*

Because the defendants have filed matters outside of the pleadings, in form of deposition testimony and other transcripts, the defendants' renewed motions to dismiss shall be considered as motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b). The court turns to the merits of the extensive catalog of issues raised in the various motions.

1. *Service of Process*

Each of the defendants has· moved to dismiss the complaint because proper service of process was not accomplished with-

in 120 days of the filing of the complaint, as required by Fed.R.Civ.P. Rule 4(j).

Rule 4(j) provides:

If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant, without prejudice, upon the court's own initiative with notice to such party or upon motion.

Rule 4(j) thus requires that this court first determine if service was, in fact, not properly made within 120 days of filing. If so, this court must then determine if there was a "good cause" for the lack of appropriate service within the 120 day period. Finally, if the court is unable to find such "good cause," Rule 4(j) demands that this action be dismissed without prejudice. The court's analysis of these issues must begin with a brief history of the lengthy saga of the plaintiff's numerous attempts at service.

The complaint in this action was filed on December 20, 1984. The plaintiff attempted service on all the defendants by certified mail, pursuant to Fed.R.Civ.P. 4(c)(2)(C)(ii); however, the plaintiff believed this attempt at service to be unsuccessful when he received no acknowledgement of service within 20 days of the date of mailing. The plaintiff then turned to the nationwide service of process provision afforded him by the RICO count in his complaint.

RICO's nationwide service of process provision allows the United States Marshal for any judicial district to serve process for a RICO action pending in any other district, upon the order of the district court in which the action is pending. See 18 U.S.C. § 1965(d). Such an order was granted by this court and, consequently, a deputy marshal for the District of Massachusetts attempted to effect personal service of process on the defendants on February 22, 1985, by leaving a copy of the summons and complaint for each defendant with an assisant to Peter Eshelman, the president of defendant American Sports Underwriters, Inc. Apparently, the plaintiff was still uncertain of the effectiveness of the marshal's service because he next retained a private process server, who was subsequently able to serve all defendants, except defendant Green [2], by March 22, 1985. Plaintiff, confident that this third attempt at service complied with Fed.R.Civ.P. 4(d)(1) and 4(d)(3), and was well within the 120 day period prescribed by Rule 4(j), then made no further efforts at service until this court dismissed the RICO count of the complaint on March 23, 1987.

After the plaintiff's RICO count had been dismissed, the plaintiff once again doubted the effectiveness of his prior service of process. Thus, the plaintiff made his fourth attempt at service when he served each of the defendants again on May 17, 1987, pursuant to the provisions of Virginia's long-arm statute. Va.Code § 8.01–329. The effectiveness of each of these four attempts at service will now be fully explored.

■■ The court need not tarry long in its evaluation of the first attempt at service. A plaintiff may certainly use registered or certified mail to effect service under Fed.R.Civ.P. 4(c)(2)(C)(ii); however, a mere return receipt for the registered mail will not satisfy the "acknowledgement" requirement of the Rule. See *Armco, Inc. v. Penrod–Stauffer Building Systems*, 733 F.2d 1087 (4th Cir.1984). Thus, the plaintiff was correct in his assumption that his attempt at service by mail was unsuccessful.

The evaluation of the plaintiff's next attempt at service presents greater difficulty. Here, the plaintiff attempted to serve a summons and complaint upon all the defendants through the use of RICO's nationwide service provision. See 18 U.S.C. § 1965(d). Of course, the plaintiff's original complaint contained four distinct

---

**2.** Defendant Green, who lives in London, England, was, apparently, not served until October 1985.

counts, only one of which is the RICO claim. The other three claims are state claims. Thus, in order to determine if the plaintiff's second attempt at service was effective, the court must first determine if the nationwide service provision applicable to the federal RICO claim could have been applied to the state claims as well.

Any reference by the plaintiff to 18 U.S.C. § 1965(d) in order to answer this question is not persuasive. This provision, by a strict interpretation of its plain language, applies only to the service of process in an action "under this chapter," meaning RICO, thus excluding the state claims from its scope. The plaintiff must turn elsewhere for authority supporting his proposition that the state claims properly hitched themselves to the nationwide service provision.

In the original complaint, the plaintiff maintains that this court may exercise subject-matter jurisdiction over these state claims either by diversity or by pendent jurisdiction. The court agrees and finds that its exercise of pendent jurisdiction over the state claims would have been appropriate had subject-matter jurisdiction not been obtained already due to diversity of citizenship. The state and federal claims arose out of a "common nucleus of operative fact" such that the plaintiff "would ordinarily have been expected to try all the claims in one judicial proceeding;" furthermore, the interests of "judicial economy, convenience, and fairness to the litigants" warranted the exercise of pendent jurisdiction over the state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

■ Because the state claims were pendent to the federal claim at the time of the plaintiff's second attempted service, the doctrine of pendent personal jurisdiction, a doctrine previously recognized by this court in *Sohns v. Dahl*, 392 F.Supp. 1208, 1218 (W.D.Va.1975), allowed the pendent state claims to ride along with RICO's nationwide service provision. *See also Gilbert v. Bagley*, 492 F.Supp. 714, 747 (M.D. N.C.1980); *Robinson v. Penn Central Co.*,

484 F.2d 553, 555 (3d Cir.1973). Of course, the fact that the four original counts could have all been served by nationwide service does not imply that all four counts were in fact served properly on each of the defendants. The appropriate manner of service under RICO's nationwide service provision presents a different set of problems.

The first sentence of Fed.R.Civ.P. 4(e) refers to federal statutes, such as RICO, which offer extraterritorial service. The Rule provides that the manner of service under such nationwide service provisions is controlled by the usual Rule 4 methods unless the federal statute prescribes a particular method of service. RICO does provide specifically for service by a federal marshal, *see* 18 U.S.C. § 1965(b), but fails to provide any other prescription for the appropriate manner of service under its nationwide service provision. The plaintiff's second attempt of service was by a marshal; however, the plaintiff's third attempt of service was by a private process server. The defendants claim that both of these attempts at service were unsuccessful.

■ First, the defendants state that the marshal's service was improper because the appropriate manner of service for individuals and corporations, as prescribed by Fed.R.Civ.P. 4(d)(1) and 4(d)(3), was not followed. Second, the defendants claim that the private process server's attempts at service were ineffective because RICO only allows for service of process by a federal marshal. The court finds merit in the defendants' first argument but remains unpersuaded by the second.

The defendants' second argument overlooks the Rules Enabling Act, which modifies all federal statutes, including RICO, to the extent that they are in conflict with the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 2072. Thus, when a federal statute, such as RICO, provides for service by a marshal, that statute should be considered modified by Fed.R.Civ.P. 4(c)(2)(A), which authorizes service by adult nonparties. 4A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1117, at 264 (2d ed. 1987). Apparently, the defendants'

only objection to the plaintiff's third attempt at service is the fact that service was effected by a private process server instead of a federal marshal. As indicated above, the court finds this argument to be erroneous. The defendants have not claimed that the manner of service by the adult nonparty failed to comply with the dictates of either Fed.R.Civ.P. 4(d)(1) or 4(d)(3). Therefore, the court finds that the complaint and summons were properly served on all the defendants, except defendant Green, by the private process server on or about March 22, 1985, well within the 120 day period mandated by Fed.R.Civ.P. 4(j).

The court now turns to the issue of defendant Green's service. The court notes that unlike the other defendants, Green, who lives in a foreign country, was apparently not served within 120 days of the filing of the plaintiff's complaint. The plaintiff ultimately served Green, pursuant to Fed.R.Civ.P. 4(i), in October 1985, approximately nine months after the filing of the complaint. The defendants have not argued that the manner of this service was improper. Therefore, the court notes that because Fed.R.Civ.P. 4(j) does not apply to service properly effected pursuant to Fed. R.Civ.P. 4(i), the defendants' contention that defendant Green should be dismissed for insufficiency of service is without merit.

 Finally, the court notes that even if it were to assume, *arguendo*, that the defendants were never properly served until the fourth attempt at service in May, 1987, the court would still find that the dismissal of the action pursuant to Fed.R.Civ.P. 4(j) would be inappropriate. The record leaves little doubt that the defendants received actual notice of the pendency of this action as a result of the plaintiff's first three attempts at service. The Fourth Circuit has held that while the Federal Rules of Civil Procedure are to be followed and not ignored, actual notice of an action will cause the rules governing service of process to be "liberally interpreted," meaning that every "technical violation of the rule or failure of strict compliance may not invalidate the service of process." *Armco,*

*Inc. v. Penrod Stauffer Building Systems,* 733 F.2d at 1089.

Although "good cause" is not defined by Rule 4(j), most courts have found that "good cause" requires both a showing of diligence and a reasonable effort to effect service by the plaintiff. *See e.g. Baden v. Craig-Hallum, Inc.* 115 F.R.D. 582, 587 (D.Minn.1987); *Motsinger v. Flynt,* 119 F.R.D. 373, 376 (M.D.N.C.1988). The plaintiff's repeated efforts at service and his good faith belief that he had properly effected service more than satisfy this standard. After this court dismissed the plaintiff's RICO claim in May, 1987, the plaintiff promptly served each defendant, including defendant Green, again, pursuant to Virginia's long-arm statute. Although the court finds that this fourth · attempt at service was unnecessary, its effectiveness is undisputed by the defendants and it further highlights the plaintiff's diligence and efforts to effect service. Thus, even if the defendants were not served properly until May of 1987, this court would refuse to dismiss the action pursuant to Fed.R.Civ.P. 4(j) as a result of the "good cause" for the delay in service.

Because the requirements of service have been fully satisfied, the defendants' motions to dismiss pursuant to Fed.R. Civ.P. 4(j) shall be denied.

## 2. Venue

 On March 23, 1987, this court dismissed Count I of the plaintiff's complaint, which contained the RICO claim. This suit is now before the court as a civil action involving only the three remaining state claims. Although this court has found that subject-matter jurisdiction over the three state claims could have been originally exercised pursuant either to the doctrine of pendent jurisdiction, or to diversity of citizenship, the court finds that since the federal claim has now been dismissed, the doctrine of pendent jurisdiction should not operate to provide subject-matter jurisdiction over the state claims. *See e.g. United Mine Workers of America v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. Instead this court's jurisdiction over the three state law

claims is now based solely on diversity of citizenship.

The venue provision applicable to this case, 28 U.S.C. § 1391(a) reads, in pertinent part,

A civil action wherein jurisdiction is founded only on diversity of citizenship may ... be brought only in the judicial district where all of the plaintiffs or all of the defendants reside, or in which the claim arose.

Mr. Selman, who constitutes all of the plaintiffs in this action, resides within the Western District of Virginia and all defendants reside outside the Commonwealth of Virginia; therefore, venue properly lies in this district. Accordingly, the defendants' motions to dismiss based on improper venue shall be denied.

### 3. *In personam Jurisdiction*

The plaintiff bases personal jurisdiction over all of the defendants upon the Virginia Long–Arm Statute, § 8.01–328.1 of the Code of Virginia. This court, sitting in diversity cases, may exercise personal jurisdiction over out-of-state defendants under each subdivision of the long-arm statute to the outermost perimeters of the due process clause of the fourteenth amendment. *Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311 (4th Cir.1982). Va.Code § 8.01–328.1(A)(1), (3), and (4), read as follows:

When personal jurisdiction over person may be exercised.—A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1. Transacting any business in this Commonwealth;

....

3. Causing tortious injury by an action or omission in this Commonwealth;

4. Causing tortious injury in this Commonwealth by an act or omission outside of this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used on consumed or services rendered, in this Commonwealth.

### a. Defendants Eshelman and Dipple

■ With respect to these two defendants, the plaintiff alleges a number of visits to the Commonwealth of Virginia for the purpose of transacting business. The plaintiff alleges in his complaint that he met in Charlottesville, Virginia, with Eshelman and Dipple to negotiate the opening of the College Division of ASU, and met later with them in Charlottesville to firm up the details of the establishment of the College Division. The plaintiff further alleges that he met again with defendant Dipple in Charlottesville in August 16, 1984, wherein Dipple gave the plaintiff assurances regarding the operation of the College Division. These activities taken together, and regarded in the light most favorable to the plaintiff, indicate to the court a clear pattern of transacting business in this Commonwealth. Moreover, it is apparent that all of the asserted causes of action contained in the plaintiff's complaint arose from these transactions. Further, by their activities in the Commonwealth, both Eshelman and Dipple have demonstrated an intent to avail themselves of the benefits and protections of the laws of Virginia. *See, United States v. Douglas*, 626 F.Supp. 621, 624 (E.D.Va.1985). Thus, this court has *in personam* jurisdiction over these defendants on all claims pursuant to Va. Code § 8.01–328.1(A)(1) and (A)(3), and the exercise of such jurisdiction comports with existing constitutional due process requirements. *See Blue Ridge Bank v. Veribanc, Inc.*, 755 F.2d 371, 373 (4th Cir.1985).

### b. Defendant ASU

■ The defendant ASU maintained a branch office in Charlottesville, Virginia, for over a year, employed the plaintiff in that office, and sent its agents to Charlottesville to negotiate the business arrangements. During the year that ASU conducted business out of the Charlottesville office, it received premium payments from insurance sales occurring in Virginia of $106,019.66.

ASU concedes that the court has *in personam* jurisdiction for Count III, but

claims that the court lacks jurisdiction for Counts II and IV. With respect to Count II, the plaintiff alleges that Eshelman and Dipple conspired to injure the plaintiff in his business and that, under *respondeat superior*, ASU is liable for their actions. With respect to Count IV, plaintiff alleges inducements by ASU's agents which amount to tortious interference with his prospective economic relations.

The defendants' objections to this court's exercise of *in personam* jurisdiction over Counts II and IV are not well-taken. This court, by construing facts in the plaintiff's favor, has already found that it may properly exercise *in personam* jurisdiction over defendants Eshelman and Dipple, both agents of defendant ASU, with respect to Counts II, III, and IV of the complaint. The court, again viewing facts in favor of the plaintiff, now finds that both the plaintiff's civil conspiracy claim and his tortious interference claim stem from the actions of ASU's agents, and that these actions were a direct result of ASU's transacting business in this Commonwealth. In addition, the court finds that the plaintiff has alleged sufficient facts to demonstrate that ASU, through the actions of its agents in this Commonwealth, caused tortious injury to the plaintiff by interference with his contractual relations. Thus, the requirements of Virginia Code § 8.01–328.1(A)(1) and (A)(3) have been satisfied and this court may exercise *in personam* jurisdiction over defendant ASU with respect to Counts II, III, and IV of the complaint. Furthermore, the exercise of this jurisdiction comports with existing constitutional requirements of due process. *See Blue Ridge Bank v. Veribanc,* 755 F.2d at 373.

### c. Defendants Lockwood, Green, LD & G and LDGM

▮▮ The plaintiff alleges in his complaint that the defendant ASU, while transacting business in this Commonwealth, merely served as an alter-ego for these defendants when they committed the alleged wrongs against the plaintiff. The plaintiff further alleges that although the defendants may have had no direct contact with the Commonwealth of Virginia, through their alter-ego ASU, they have nevertheless committed tortious injury in Virginia by their acts outside the Commonwealth and have derived substantial revenues from services provided in the Commonwealth. The plaintiff asserts, therefore, that this court has *in personam* jurisdiction over these defendants pursuant to Va.Code § 8.01–328.1(A)(1) and (4).

If the plaintiff's allegations as to these defendants are correct, these particular defendants are certainly within the scope of this court's *in personam* jurisdiction, pursuant to Va.Code § 8.01–328.1(A)(1) and (4). This court, viewing the facts in the light most favorable to the plaintiff, *see Conley,* 355 U.S. at 46, 78 S.Ct. at 102, accepts the plaintiff's alter-ego theory. Therefore, these defendants' motions to dismiss for lack of *in personam* jurisdiction shall be denied at the present time. If further discovery reveals that ASU was neither the alter-ego nor the agent of these defendants in their dealings with the plaintiff, the court will reconsider its present ruling and entertain a renewed motion to dismiss for lack of *in personam* jurisdiction over these defendants.

### 4. *Count II of the Plaintiff's Complaint*

▮▮ Count II of the plaintiff's claim is based upon the Virginia Civil Conspiracy statute, Va.Code § 18.2–499, 500, which provides in pertinent part:

(a) Any two or more persons who shall combine, associate, agree, mutually undertake or consort together for the purpose of wilfully and maliciously injuring another in his reputation, trade, business or association by any means whatsoever, ... shall be jointly and severally guilty of a Class 3 misdemeanor....

Va.Code § 18.2–499(a). The subsequent section provides for civil relief.

Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2–499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel....

Va.Code § 18.2–500(a). A "person" under the statute means any person, firm, corporation, partnership or association. Va.Code § 18.2–501(b).

In the plain meaning of these provisions, if the defendants conspired maliciously to injure the reputation, trade, business or profession of Mr. Selman in any manner, Mr. Selman may receive treble damages, costs, and attorney's fees. *See, Nationwide Fire Insurance Co. v. Jones,* 577 F.Supp. 968, 969 (W.D.Va.1984) (J. Williams). As an initial matter, the plaintiff has set forth specific allegations regarding the activities engaged in by LD & G, Eshelman, Dipple, Lockwood, and Green. These activities include conspiring to deprive the plaintiff of his contractual right to obtain an equity interest in ASU, conspiring and influencing other persons not to conduct business with the plaintiff, and making disparaging remarks about the plaintiff to persons in a position to do business with the plaintiff. (Complaint ¶ 67). The plaintiff further alleges that, as a result of the defendants' various actions, he has suffered injury to his business and profession, "including ... being unable ... to operate as a broker in the collegiate sports insurance business." (Complaint ¶ 68). The court finds that these allegations are initially sufficient to satisfy the threshold demands of Virginia's civil conspiracy statute. *Id.* However, the court also finds that these allegations are not sufficient to overcome the considerable obstacle provided by the intracorporate immunity doctrine.

Simply put, the doctrine of intracorporate immunity holds that because at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself. Since a corporation is merely a legal entity wholly created by law, it can only act through its agents, officers, and employees; therefore, a conspiracy between a corporation and the agents of that corporation who are acting in the scope of their employment is a legal impossibility. *Griffith v. Electrolux Corp.* 454 F.Supp. 29, 32 (E.D.Va.1978). In addition, the court notes that the Fourth Circuit

has held, in its affirmance of a judgment of this court, that the immunity granted under the doctrine to a corporation and its agents is not destroyed when the agents are sued as individuals. *Buschi v. Kirven,* 775 F.2d 1240, 1252 (4th Cir.1985).

As the court applies the doctrine to the facts of this action, the court first finds a curious inconsistency in the position of the plaintiff. The plaintiff has alleged, for purposes of *in personam* jurisdiction over defendants Lockwood, Green, LD & G, and, pursuant to the amended complaint, LDGM, that these defendants all used defendant ASU as their "alter ego." That is, the plaintiff suggested that the defendant corporations all operated as a single entity. Both the plaintiff's original and amended complaint strongly emphasize the tangled interdependence of the corporate and individual plaintiffs. (Complaint, ¶ 17–22; amended complaint, ¶ 17–23). More pointedly, the amended complaint specifically alleges that corporate defendants ASU, LD & G, and LDGM, all "function and operate as one entity." (Amended complaint, ¶ 19). As a result of these pleadings, this court has already accepted the plaintiff's "alter ego" and agency theories for the purpose of exercising *in personam* jurisdiction over the various defendants.

But now, in order to find that the defendants were in fact legally capable of a conspiracy, the plaintiff suggests that the court, in effect, reverse its prior holding, and find that the defendant corporations were actually discrete and wholly separate legal entities. The court is not inclined to participate in such mental sleight-of-hand. The court also points out that the doctrine of intracorporate immunity applies to parent and subsidiary corporations. *See In re Dobbins Lincoln–Mercury, Inc.,* 604 F.Supp. 203, 204 (W.D.Va.1984), *aff'd,* 813 F.2d 402 (4th Cir.1985). Thus, the doctrine of intracorporate immunity applies to the facts of this action, where, as shown by the plaintiff's own pleadings, the corporate defendants all comprise one entity and the individual defendants were all agents acting to further the interests of that entity.

However, the plaintiff correctly notes an exception to intracorporate immunity. The Fourth Circuit has found that, pursuant to Virginia law, the doctrine does not apply when an agent of the corporation has an "independent personal stake in achieving the corporation's illegal objective." *Buschi v. Kirven*, 775 F.2d at 1252, citing *Greenville Publishing Co., Inc. v. Daley Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir.1974).

The court finds that this "independent personal stake" exception must not be interpreted in too broad a manner or it will consume the entire intracorporate immunity doctrine. Certainly, under the most permissive interpretation of its language, an employee or agent of a corporation would always meet the exception since he would surely have an independent personal stake in the health and profitability of the corporation. Such an interpretation is overbroad. Instead, this court will follow the Fourth Circuit's implicit suggestion that the exception was meant to apply to facts such as those of *Greenville Publishing*, 496 F.2d at 400. Here, the conspirator gained a direct personal benefit from the conspiracy, a benefit wholly separable from the more general and indirect corporate benefit always present under the circumstances surrounding virtually any alleged corporate conspiracy.

Although the plaintiff has alleged in his complaint that the defendants conspired to deprive him of an equity interest in ASU, such an allegation falls well short of the type of personal and independent benefit contemplated by the Fourth Circuit in *Greenville Publishing*. Furthermore, the plaintiff has not alleged that the defendants were dominated by personal motives or that the actions of the individual defendants somehow exceeded the scope of their employment. *See Griffith v. Electrolux Corp.*, 454 F.Supp. at 32. As a result, the court finds that the "independent and personal stake" exception cannot operate to save the plaintiff's claim from the bar provided by the intracorporate immunity doctrine, and that the defendants are entitled to judgment on Count II as a matter of law. Therefore, the defendants' motions for summary judgment on Count II of the plaintiff's complaint will be granted and summary judgment shall be entered against the plaintiff.

5. *Count III*

In Count III of his complaint (Amended Complaint §§ 90–96), the plaintiff asserts a breach of contract claim based upon the alleged breach of the employment contract existing between himself and defendant ASU. The defendants have moved for summary judgment on Count III, claiming that the doctrine of "employment at will" completely bars any breach of contract claim and that the defendants are thus entitled to judgment as a matter of law pursuant to Fed.R.Civ.P. 56(c). The defendants argue alternatively that even if the court finds that the contract was to be for a definite term, and thus not "at will," that term could only have been for one year, and the defendants fully performed their contractual obligations pursuant to the one-year contract. For the reasons discussed below, the court finds neither of the defendants' arguments persuasive, and holds that summary judgment is inappropriate for Count III of the complaint.

The defendants are correct in their assertion that the doctrine of employment at will acts as a considerable hurdle which the plaintiff must first clear as he attempts to pursue a cause of action for a breach of his employment contract. In *Miller v. SEV-AMP, Inc.*, 234 Va. 462, 362 S.E.2d 915 (1987), the Virginia Supreme Court recently explained the doctrine, as interpreted in Virginia, by stating that "when the intended duration of a contract for the rendition of services cannot be determined by fair inference from the terms of the contract, then either party is ordinarily at liberty to terminate the contract at will, upon giving the other party reasonable notice." *Id.* at 465, 362 S.E.2d at 917. The court went on to hold that "in Virginia, where no specific time is fixed for the duration of the employment, there is a rebuttable presumption that the hiring is terminable at will." *Id.*

Still, the court was careful to point out that the doctrine is not absolute. *Id.* The

court noted that in Virginia a plaintiff alleging a breach of an employment contract may avoid the employment at will doctrine and sufficiently state a cause of action in either of two situations. First, the terms of the contract, whether written or oral, may infer a specific period of duration. Second, the contract may be supported by some "additional consideration" which is sufficient to remove the contract from the presumptive "at will" category. *Id.* at 466, 362 S.E.2d at 918. The plaintiff has argued that both of these conditions have been satisfied and therefore the doctrine of employment at will does not bar his breach of contract claim. While the court does not hold that either or both of these conditions apply to the plaintiff's cause of action, the court does find that the plaintiff's arguments rest upon genuine issues of material fact which are in dispute. The resolution of these factual disputes will determine the viability of the plaintiff's breach of contract claim. Given these circumstances, summary judgment is, of course, inappropriate.

First, the plaintiff contends that even though the contract contains no specified period or duration, it should not be viewed as "indefinite" or "at will" because the implied terms of the contract suggest that the makers of the contract anticipated its duration to be for a period of at least two years, not merely one year as the defendants have argued in the alternative. Of course, if the plaintiff is able to demonstrate the existence of a term of two or more years, he will have effectively negated both the defendants' "employment at will" and their "performance" arguments upon which they have premised this motion for summary judgment.

In support of this contention that the contract contained a definite term of two or more years, the plaintiff stresses the promised "equity interest" in defendant ASU which he was to receive after one year of sufficiently profitable operation. (Amended complaint ¶¶ 38–40). The plaintiff claims that this provision demonstrates that the contract was to last for at least two years and was thus not strictly "at will." In addition, the plaintiff has attempted to fortify his position by claiming that the conduct and representations of the defendants during the summer and fall of 1984 constitute parole evidence which again demonstrates the parties' own belief that the employment contract was never strictly "at will" and was interpreted to be for a definite duration of at least two years. (Amended complaint ¶¶ 48–59, complaint exhibits 6 and 8).

For the purposes of this motion, the court need not attempt to measure the strength of these arguments made by the plaintiff. It need only find that the arguments rest upon facts which are subject to differing and reasonable interpretations, interpretations which are properly made by a finder of fact and not by this court as it considers a motion for summary judgment. *See e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court, while deciding a motion for summary judgment, must not balance facts subject to differing interpretations in order to decide the terms of this employment contract. *Id.* The law of employment contracts, as recognized in Virginia, states that "where evidence concerning the terms of a contract of employment is in conflict, the question [of] whether the employment is at will or for a definite term becomes one of fact for resolution by a jury." *Miller v. SEVAMP,* Id. at 465, 362 S.E.2d at 917, citing *Buchanan & Son v. Ewell,* 148 Va. 762, 771, 139 S.E. 483, 485 (1927). The court, upon finding conflicting evidence bearing upon the duration of the contract, must conclude that summary judgment is inappropriate for Count III pursuant to Fed.R.Civ.P. 56(c).

The plaintiff has also argued that summary judgment is inappropriate for Count III of the complaint because the employment contract was supported by "sufficient" additional consideration which took it out of the employment at will category. *See Id.* at 465, 362 S.E.2d at 917, (promise of employment provided adequate federal funding continues not sufficient); *see also Sea–Land Service, Inc. v. O'Neal,* 224 Va. 343, 297 S.E.2d 647 (1982) (promise of promotion to better job if employee resigned

present job held sufficient); *Twohy v. Harris*, 194 Va. 69, 72 S.E.2d 329 (1952) (promise of bonus measured by stock value if employee remained on job held sufficient). In effect, the plaintiff argues that the promise of an equity interest in defendant ASU, once the company reached a designated level of profitability, amounts to "an undertaking separate and apart from any contract covering the particular position involved." *Sea–Land Service, Inc. v. O'Neal*, 224 Va. at 349, 297 S.E.2d at 650.

Although the court in no way presumes to measure the strength of this argument, it does find that in order to determine if the promised equity interest in ASU truly amounts to the type of additional consideration which is sufficient to pull the contract from its regular orbit of employment at will, ambiguous facts must once again be scrutinized and interpreted. Accordingly, summary judgment for Count III is once again inappropriate.

Finally, the plaintiff contends that his employment contract contained an implied covenant of "good faith dealing" which was subsequently breached by the defendants. The plaintiff admits that the Supreme Court of Virginia has yet to recognize such an implied covenant; nevertheless, he urges this court to affirm the viability of a cause of action based upon the breach of this implied contractual term. The plaintiff makes this suggestion in spite of the generally held view that federal courts applying a state's law should not provide a cause of action which that state has not recognized. *See Guy v. Travenol Laboratories, Inc.*, 812 F.2d 911, 970 (4th Cir.1987). This court finds that, for the purposes of this motion, it need not determine the viability of a Virginia cause of action for the breach of an implied covenant of good faith dealing. The court will therefore reserve judgment on this issue until a later date.

Because the plaintiff has produced evidence which shows that the resolution of the breach of contract claim contains genuine issues of disputed material facts, the defendants' motions for summary judgment on Count III of the complaint, pursuant to Fed.R.Civ.P. 56(c), shall be denied.

### 6. *Count IV of the Plaintiff's Complaint*

█ In Count IV of this complaint (¶¶ 78–83), the plaintiff asserts a common law claim based upon the defendants' tortious interference with his prospective economic relations. This cause of action, first recognized in Virginia in the case of *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984), arises from an "intentional, and improper interference with another's contractual relations, and this interference must (1) induce or otherwise cause a third party not to enter a prospective contract with the plaintiff, or (2) prevent the plaintiff from entering into a contract." *Id.* at 449, 318 S.E.2d at 597. The defendants have presented evidence in the form of various affidavits which contradict the allegations contained in Count IV of the plaintiff's complaint. Consequently, the defendants have moved for summary judgment on Count IV pursuant to Fed.R.Civ.P. 56(e), claiming that the plaintiff has rested upon the mere allegations of wrongdoing contained in his complaint and has failed to set forth any specific fact showing that there is a genuine issue for trial.

Plaintiff bases his tortious interference claim upon allegations that defendant Eshelman, acting on behalf of ASU and thus, presumably, the remaining defendants as well, induced Ben Schenck of State Mutual Assurance Company of America and Ray Hoare of Blackwell, Green, Ltd. not to do business with him. Plaintiff's complaint specifically alleges that on November 5, 1984, he telephoned both Schenck and Hoare in unsuccessful efforts to solicit business, and during those conversations both men told him that they preferred not to do business with him because of his antagonistic relationship with defendant ASU, with whom both Schenck and Hoare had a continuing business relationship. (Amended complaint ¶¶ 98–101). Although the plaintiff has submitted an affidavit verifying the facts contained in his complaint, he has produced no further evidence, except these telephone conversations, which

tends to substantiate the allegations contained in Count IV.

In contrast, the defendants have produced evidence in the form of affidavits to rebut the plaintiff's claim of tortious interference. Such evidence includes an affidavit by Hoare which states that he had no conversations with defendant Eshelman or anyone else representing defendant ASU regarding the advisability of doing business with the plaintiff. (Hoare affidavit, p. 2). Hoare further states that the decision to avoid a business relationship with Selman was strictly his own and was made in accord with what he believed to be the best interests of Blackwell, Green, Ltd. (Hoare affidavit, p. 2). Likewise, the defendants have also produced an affidavit of Schenck in which he too states that neither defendant Eshelman nor any other representative of ASU ever suggested that he forego business relations with the plaintiff after his dismissal from ASU. (Schenck affidavit, p. 2). Instead, Schenck, like Hoare, states that his decision not to deal with Selman was exclusively his own and that no one representing ASU ever suggested, either directly or indirectly, that he avoid doing business with Selman. (Schenck affidavit, p. 2).

The plaintiff has argued that these affidavits should be given little weight because of their "self-serving" nature. The court is puzzled by this objection as it finds that the affidavits of both Schenck and Hoare are certainly sufficient for the purposes of a motion for summary judgment pursuant to Fed.R.Civ.P. 56(e).[3] Of course, the court recognizes that a motion for summary judgment must be considered carefully and is not to be granted merely because a defendant swears that he is innocent of any wrongdoing. But the court also recognizes that Fed.R.Civ.P. 56(e) makes certain demands on the parties and it is ultimately the duty of the court to see that those demands are followed.

Rule 56 requires a party seeking summary judgment to bear the initial responsibility of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This burden may be satisfied by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *See e.g. Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 847 (4th Cir.1988), citing *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. at 2554. Rule 56(e) states further that the non-moving party must then go beyond his pleadings and, by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Although the offered evidence must be viewed in the light most favorable to the non-moving party, *see e.g. United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), that evidence must still provide a genuine issue for trial, pursuant to Fed.R.Civ.P. 56(e), that is, the evidence must be "such that a reasonable jury could return a verdict for the non-moving party." *See e.g. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The court, after careful consideration, finds that the plaintiff has failed to go beyond the mere allegations contained in his complaint, and has thus failed to set forth the requisite facts which demonstrate a genuine issue for trial. The specific facts presented to the court on the plaintiff's behalf, even when viewed in the light most favorable to the plaintiff, amount to no more than two inconclusive telephone conversations. At best, these conversations may demonstrate that Hoare and Schenck decided not to do business with Selman because of their desire to maintain good relations with defendants Eshelman and ASU. Yet this motivation alone does not constitute tortious interference with prospective contractual relations pursuant to Virginia law. *See Allen Realty Corp. v. Holbert*, 227 Va. at 449, 318 S.E.2d at 597.

---

**3.** Rule 56(e) provides that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The conversations in no way provide the necessary evidence demonstrating that Eshelman or any representative of ASU *"intentionally and improperly"* interfered with Selman's contractual relations. *Id.* In contrast, the defendants have produced affidavits of both Hoare and Schenck which affirmatively state that neither Eshelman nor ASU ever attempted to influence their decisions regarding future business with Selman. On the facts presently before the court, a reasonable jury could not find that the defendants tortiously interfered with the plaintiff's contractual relations.

Still, the plaintiff seeks to excuse his inability to go beyond the allegations contained in his pleadings by reference to this court's decision to limit discovery in this action to the "bad faith" issue as contained in Count I of the complaint. Although the plaintiff has never, pursuant to Fed.R.Civ. P. 56(f), moved the court for the opportunity to depose Schenck or Hoare, or moved for a modification of the present limitations on discovery, the plaintiff nevertheless argues that it would be patently unfair to rely upon these two affidavits for the purposes of summary judgment because the plaintiff has not cross-examined Hoare or Schenck.

In response to this point, the court would first note that a ruling on motion for summary judgment pursuant to Fed.R.Civ.P. 56(e), as already explained, is appropriate when a non-moving party is unable to present facts beyond the allegations of his pleadings, and thus the motion is evaluated more on the non-moving party's paucity of facts than on the moving party's abundance of them. However, the court recognizes that summary judgment may certainly be inappropriate in some cases where the non-moving party is unable to offer facts due to insufficient time or opportunity to engage in discovery. *See generally* 10A C. Wright, A. Miller, & M. Kain, *Federal Practice and Procedure* § 2741 (2d ed. 1983). But the Supreme Court has made it clear that limitations on discovery do not necessarily render summary judgment inappropriate. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 298, 88 S.Ct. 1575, 1597, 20 L.Ed.2d 569 (1968). Instead, summary judgment is still appropriate, despite limitations on a non-moving party's discovery, if the discovery that was allowed was in fact sufficient to enable the non-moving party to substantiate his claim to the extent of raising a material issue of fact or of providing a basis for his own investigation to gather additional evidence. *Id.*

Although the plaintiff has been unable to depose and cross-examine either Schenck or Hoare due to the limitations on discovery, this court finds that the permitted discovery has been sufficient in both scope and duration to allow the plaintiff at least to raise an issue of material fact *or* to provide a basis for his own investigation in order to gather additional evidence in support of his claim in Count IV. *Id.* The court finds that the plaintiff has surely had more than ample time to investigate fully his allegations of tortious interference and to produce some specific fact, beyond those mere allegations contained in his complaint, which generates an issue of material fact sufficient to withstand a motion for summary judgment. If the plaintiff had any objective reason to believe that the testimony of Hoare and Schenck were not true, he certainly could have presented that information to the court through affidavit, and such specific factual evidence might have prevented the imposition of summary judgment. Yet the plaintiff has produced nothing of the sort required. Since the plaintiff apparently has no factual information which casts doubt on the veracity of the statements made in Hoare's and Schenck's affidavits, and since the plaintiff has had ample opportunity to present such evidence, this court must conclude that Count IV of the plaintiff's complaint is simply a factually unsupported claim based upon suspicion and conjecture.

The Supreme Court has specifically held that one of the principal purposes of the summary judgment rule is "to isolate and dispose of factually unsupported claims," and "the rule should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett,* 477 U.S.

244

at 323–34, 106 S.Ct. at 2553–54. Because the plaintiff has not set forth specific facts which show a genuine issue for trial, the defendants' motions for summary judgment as to Count IV of the complaint shall be granted, and summary judgment shall be entered against the plaintiff.

As a result of this court's foregoing findings in regard to the plaintiff's motion to amend his complaint and in regard to the defendants' various motions to dismiss, this action is now ready to proceed to trial solely on Count III, with all the defendants, both individual and corporate, presently remaining as parties to the litigation.

An appropriate Order shall this day issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day ADJUDGED AND ORDERED as follows:

1. The motion to dismiss for improper service of process brought by defendants Lockwood, Dipple & Green, Dipple, Lockwood, and Green shall be, and it hereby is, denied.

2. The motion to dismiss for improper service of process brought by defendants American Sports Underwriters, Inc., and Eshelman shall be, and it hereby is, denied.

3. The motion to dismiss for improper venue brought by defendants Lockwood, Dipple & Green, Dipple, Lockwood, and Green shall be, and it hereby is, denied.

4. The motion to dismiss for improper venue brought by defendants American Sports Underwriters, Inc., and Eshelman shall be, and it hereby is, denied.

5. The motion to dismiss for lack of *in personam* jurisdiction brought by defendants Lockwood, Dipple & Green, Dipple, Lockwood, and Green shall be, and it hereby is, denied.

6. The motion to dismiss for lack of *in personam* jurisdiction brought by defendants American Sports Underwriters, Inc., and Eshelman shall be, and it hereby is, denied.

7. The motion for summary judgment as to Count II of the plaintiff's complaint brought by defendants Lockwood, Dipple & Green, Dipple, Lockwood, and Green shall be, and it hereby is, granted.

8. The motion for summary judgment as to Count II of the plaintiff's complaint brought by defendants American Sports Underwriters, Inc., and Eshelman shall be, and it hereby is, granted.

9. The motion for summary judgment as to Count III of the plaintiff's complaint brought by defendants Lockwood, Dipple & Green, Dipple, Lockwood, and Green shall be, and it hereby is, denied.

10. The motion for summary judgment as to Count III of the plaintiff's complaint brought by defendants American Sports Underwriters, Inc., and Eshelman shall be, and it hereby is, denied.

11. The motion for summary judgment as to Count IV of the plaintiff's complaint brought by defendants Lockwood, Dipple & Green, Dipple, Lockwood, and Green shall be, and it hereby is, granted.

12. The motion for summary judgment as to Count IV of the plaintiff's complaint brought by defendants American Sports Underwriters, Inc., and Eshelman shall be, and it hereby is, granted.

13. The motion to amend the complaint brought by the plaintiff shall be, and it hereby is, granted in part and denied in part.